PHILLIP T. WHITEAKER, Judge
Jonathan Jacob Buck appeals a Sebastian County Circuit Court order terminating his parental rights to MT('07), JT('08), MT('09), and JT('14).[1] He argues that the termination order should be reversed because he was denied his statutory right to counsel. Further, because his paternity was never established as to MT('07) and JT('08), he argues that there was insufficient evidence to support termination of his parental rights as to them. Because Buck was denied his statutory right to counsel, we reverse the order terminating his parental rights and remand for further proceedings.
*233 I. Facts
Buck is married to Penelope Thomas-Buck, who is the mother of eight children-MT('01), JT('02), MT('04), JT('05), MT('07), JT('08), MT('09), and JT('14). The Arkansas Department of Human Services (DHS) has a history with the family going back to October 2011.[2] Four years later, in October 2015, DHS received a referral alleging environmental neglect regarding Buck and Thomas-Buck. DHS made a true finding of the allegations and a protective-services case was opened in November 2015.
On May 20, 2016, while the protective-services case was open, DHS investigated a report that a sex offender was residing in the Buck/Thomas-Buck household. Buck was in the home when DHS arrived to conduct its investigation. Both Buck and Thomas-Buck disclosed to DHS that they were aware that their guest is a level 3 sex offender. DHS also found the house to be in a "disgusting, unsanitary and extremely unsafe condition" for the children.[3] Based on the parents' poor compliance with the protective-services case plan, including the deplorable condition of the home, the inability to maintain a clean and appropriate home for the children, and the parents' failure to protect the children from a sex offender, DHS exercised a seventy-two-hour hold on the children and removed the children from both Buck and Thomas-Buck. The court subsequently adjudicated the children dependent-neglected and ultimately terminated Buck's parental rights to MT('07), JT('08), MT('09), and JT('14).
II. Right to Counsel
For his first point on appeal, Buck argues that he was denied his statutory right to counsel pursuant to Arkansas Code Annotated § 9-27-316 (Supp. 2017). Under the juvenile code, the State of Arkansas has established that a parent has a right to be represented by counsel at all stages of dependency-neglect proceedings. Ark. Code Ann. § 9-27-316(h)(1)(A) (stating unequivocally that "[a]ll parents and custodians have a right to counsel in all dependency-neglect proceedings"). The State of Arkansas has gone further and established a statutory right to the appointment of parent counsel. Specifically, section 9-27-316(h)(1)(B) provides that parents from whom custody is removed shall have the right to be appointed counsel, and the court shall appoint counsel if the court makes a finding that the parent or custodian from whom custody was removed is indigent and counsel is requested by the parent or custodian. In fact, section 9-27-316(h)(1)(C) states that parents shall be advised in the dependency-neglect petition or the ex parte emergency order, whichever is sooner, and at the first appearance before the court, of the right to counsel and the right to appointed counsel, if eligible, and that, as required under section 9-27-314, a circuit court shall appoint counsel in an ex parte emergency order and shall determine eligibility at the commencement of the probable-cause hearing. Ark. Code Ann. § 9-27-316(h)(1)(C)(i), (ii).
Under the facts presented here, Buck was clearly entitled under the statute to appointed counsel from the very outset of these proceedings but was not provided *234 one. Buck was living in the home at the time of removal.[4] DHS filed a petition for emergency custody and dependency-neglect alleging that Buck is the legal father of MT('09) and JT('14) and the putative father of MT('07) and JT('08) and that removal was from both Buck and Thomas-Buck. However, the affidavit DHS attached in support of the petition recited that custody was removed from Thomas-Buck only. The court then entered an ex parte order for emergency custody, containing the language of section 9-27-316(h)(1)(C) -that the parents had a right to an attorney at each stage of the proceedings and that legal assistance could be obtained (1) by retaining private counsel, (2) by contacting Legal Services, or (3) if indigent, by requesting that the court appoint legal counsel. The court then made a preliminary finding based on the affidavit of DHS that the children were removed from the custody of Thomas-Buck, that she was indigent, and that she was entitled to appointed counsel. The court made no such finding as to Buck in the ex parte order.
A probable-cause hearing was held on June 7, 2016; Buck was present but was not represented by counsel. The court entered an order finding probable cause based in part upon "Jonathan Buck ... allowing a sex offender to stay in the home with the juveniles" and ordering Buck to comply with certain conditions. The court's probable-cause order does not address Buck's eligibility for appointment of counsel.
Throughout the remainder of the proceedings (i.e., adjudication, review, case staffing, and permanency planning), Buck was present but unrepresented by counsel. When the court changed the goal to termination of parental rights, Buck was appointed counsel and was represented by counsel at the termination hearing.
Buck argues that the trial court erred when counsel was not appointed until the goal of the case was changed to termination of parental rights and that the failure to appoint counsel at the outset tainted the entire dependency-neglect proceeding. Buck is correct that the trial court erred by not appointing him counsel from the outset of the dependency-neglect proceedings under Arkansas law. DHS does not challenge Buck's assertion that he was entitled to counsel at the beginning of the dependency-neglect proceedings and that the failure to appoint counsel was error. Rather, DHS denies that this error tainted the entire dependency-neglect proceeding and that reversal is warranted. Instead, DHS posits that the failure to appoint counsel was harmless error given that Buck was subsequently appointed counsel to represent him at the termination hearing and that he was so represented.
In discussing harmless error, we note that there are two separate and distinct rights to counsel in dependency-neglect proceedings. First, a parent may have a due-process right to counsel in dependency-neglect proceedings. The United States Supreme Court has found that a parent's due-process right to counsel in dependency proceedings is not absolute, but must be determined, on a case-by-case analysis, on the basis of fundamental fairness-(1) when the case presents a specially troublesome point of law and (2) when presence of counsel would have made a determinative difference. See *235 Lassiter v. Dep't of Soc. Servs. , 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Second, a parent may have a statutory right to counsel conferred by the State. Unlike the due-process right to counsel, which arises only if the circumstances of each particular case indicate that fundamental fairness requires the appointment of counsel, this State-conferred statutory right is governed by the certain defined circumstances contained within the statute. On appeal, Buck argues only that he was denied his statutory right to counsel under Arkansas Code Annotated section 9-27-316.
As noted above, DHS does not dispute that Buck was entitled to counsel at the onset and the failure to provide him counsel was error, but it claims instead that the error was harmless. Essentially, DHS takes the position that all the evidence that led up to the termination was presented at the termination hearing. DHS asserts that this evidence clearly proved that Buck had a history of aggressive behavior, domestic violence, substance abuse, criminal involvement-including incarcerations, and noncompliance with court orders. Since Buck had the benefit of court-appointed counsel when this evidence was presented, DHS contends that any error of the court in failing to appoint him counsel at earlier stages of the proceedings was harmless. We cannot agree that such a failure was harmless error.
DHS cites Briscoe v. Arkansas Department of Human Services , 323 Ark. 4, 912 S.W.2d 425 (1996), in support of its argument that any error in the trial court's failure to appoint counsel prior to termination was harmless and therefore should not result in a reversal. In Briscoe , the mother was notified of her statutory right to counsel in the dependency-neglect petition; at adjudication, she was appointed counsel, who continued to represent her through termination. Based on the "limited circumstances" found in Briscoe , our supreme court found that it was harmless error when the trial court failed to appoint counsel earlier than adjudication. We find the "limited circumstances" contained in Briscoe are distinguishable from the matter at hand. Moreover, Briscoe does not stand for the proposition that failure to appoint counsel is always harmless, and under the facts of this case, we do not hold that the error was harmless.
It is undisputed that Buck should have been appointed counsel at the onset of the proceeding. Had that occurred, Buck would have been given an attorney to represent his interest subject to Administrative Order No. 15.1(3), which provides, in part that
c. [a]n attorney shall diligently and zealously protect and advance the client's interests, rights and goals at all case staffings and in all court proceedings.
d. [a]n attorney shall advise and explain to the client each stage of the court proceedings and the likelihood of achieving the client's goals. An attorney, where appropriate, shall identify alternatives for the client to consider, including the client's rights regarding any possible appeal, and explain the risks, if any, inherent in the client's position.
e. [a]n attorney shall appear at all hearings and present all evidence and develop all issues to zealously advocate for his or her client and to further the client's goals.
f. [a]n attorney shall advocate for specific and appropriate services for the parent to further the client's goals.
g. [a]n attorney shall monitor implementation of case plans and court orders to further the client's goals.
h. [a]n attorney shall file appropriate pleadings to further the client's goals.
i. [a]n attorney shall review the progress of the client's case and shall advocate *236 for timely hearings when necessary to further the client's goals.
j. [a]n attorney shall request orders that are clear, specific, and, where appropriate, include a time line for assessment, services, placement, and treatment.
Because he was not appointed counsel from the outset, Buck was not afforded these essential and vital services an attorney would have provided. He did not have an attorney to advise him and explain to him each stage of the proceedings and the likelihood of achieving his goals. He did not have anyone to explain to him the risks inherent in the positions taken at the hearings or the possibility of appeal. Buck did not have the benefit of appointed counsel at adjudication, which is an appealable matter.[5] In the adjudication order, the court made a dependency-neglect finding on the basis of the mother's stipulation that the children were dependent-neglected due to the parental unfitness and neglect of both parents because of environmental neglect, the substance abuse of Buck, and the presence of a known sex offender in the home. There is no evidence in the record that Buck assented to these stipulations or that he understood the gravity of stipulations as they related to his parental rights. Had he been appointed the counsel to which he was entitled, Buck could have challenged these findings at not only the trial court level but also on appeal. At the very least, counsel could have requested an order that accurately represented the facts in the case or one that was clearer and more specific as to Buck's status in relation to each of the children and his role in their removal from the home.
Moreover, he did not have anyone to diligently and zealously protect and advance his interests, rights, and goals at, not only the court proceedings, but also at all case staffings. Buck testified at the termination hearing that he stopped attending staffings because he had repeatedly asked for and been denied counsel and felt that he had no one to advocate for him.[6] He testified that he believed from the very beginning that DHS did not want to reunify the children with him. He did not have anyone to advocate for specific and appropriate services for him or to monitor implementation of the case plan. In fact, while there was evidence presented that Buck suffered from anger-management and substance-abuse issues and had prior incidents of domestic violence, DHS admitted that he was not provided any anger-management, substance-abuse, or domestic-violence classes by the department.
Moreover, Buck did not have the benefit of counsel to monitor implementation of case plans and court orders to further his goals. From the onset, Buck was identified as a putative father to some of Thomas-Buck's children. In the order of probable cause, the court ordered DNA testing to determine paternity. The subsequent court orders make no further mention of this testing or the establishment of paternity as to these children. At the very least, counsel could have ensured that Buck obtained the DNA test ordered by the court in order to verify his paternity with regard to the children.
*237 On the facts of this case, we simply cannot conclude that appointment of counsel might not have made some difference in the outcome. In a case in which the interests and rights of the parents and the children are fundamental rights, we must always err on the side of caution. For these reasons, we hold that the error in failing to appoint counsel was not harmless.
III. Sufficiency of the Evidence regarding MT('07) and JT('08)
Buck's last point on appeal involves the sufficiency of the evidence surrounding the termination of his parental rights as to MT('07) and JT('08). He argues that the statutory grounds used by the court to terminate his parental rights all contain the element that a "parent" acted or failed to act in some manner. He contends that since he was never adjudicated or declared to be the "parent" of MT('07) or JT('08), and since DHS never provided a referral for DNA testing or introduced any proof of parentage at the termination hearing, DHS failed to sufficiently prove those statutory grounds. DHS argues that Buck failed to demonstrate prejudice from the trial court's termination of his "non-existent" parental rights, and because he does not challenge the sufficiency of the evidence on the termination of his parental rights to MT('09) and JT('14), which exposes him to the risk of automatic grounds for termination as to MT('07) and JT('08), he cannot show prejudice. However, because we reverse the termination of Buck's parental rights to MT('09) and JT('14), we need not reach these arguments. First, the reversal on MT('09) and JT('14) nullifies DHS's argument that there is an automatic ground for termination as to MT('07) and JT('08). Second, appointed counsel on remand will likely advocate for DHS to comply with the trial court's order to refer Buck for DNA testing, which would possibly render DHS's arguments regarding Buck's "non-existent" parental rights moot.
Reversed and remanded.
Abramson and Virden, JJ., agree.

Buck is the legal father of MT('09) and JT('14) and the putative father of MT('07) and JT('08). The numbers to the right of the juveniles' initials represent their birth years.

There was a true finding on Buck of environmental neglect and physical abuse as to a child. DHS opened a protective-services case based on this finding, as well as to true allegations of inadequate supervision and environmental neglect relating to Thomas-Buck.

DHS reports indicate that the home had animal feces and urine distributed throughout, including the children's bedrooms; that the sinks and toilets were full of human feces; and that trash and clothing were scattered throughout the home.

The DHS caseworker admitted during testimony at the termination hearing that the children were removed from his custody.

We note that this is factually distinguishable from Briscoe because the parent did have counsel at this appealable stage of the proceeding.

Buck's assertions were corroborated by the DHS caseworker who admitted that Buck had requested counsel, and he had refused to attend a staffing in December 2016 because one had not been appointed to him.