**2022 UT App 53**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF K.S. AND C.S.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

C.G.S.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20210520-CA
Filed April 28, 2022

Fourth District Juvenile Court, Heber City Department
The Honorable Brent H. Bartholomew
No. 1041288

Sheleigh A. Harding and Beau Dean Blackley,
Attorneys for Appellant

Sean D. Reyes, Carol L. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

HARRIS, Judge:

¶1 After a bench trial, the juvenile court terminated C.G.S.'s (Father) parental rights regarding K.S. and C.S. (collectively, the Children). The court determined that multiple statutory grounds for termination were present and that it was in the Children's best interest for Father's rights to be terminated. Father now appeals, and we affirm.

BACKGROUND

¶2 Father is the biological father of C.S. (born in 2009), and asserts that he is the biological father of K.S. (born in 2007), although his parental rights with regard to K.S. have never been established. Both Children share the same mother (Mother).

¶3 The family's first encounter with the child welfare system took place in 2010, when the Children were adjudicated as neglected by both Father and Mother—who were living together at the time—and were placed under the jurisdiction of the juvenile court. Over the next few months, the Division of Child and Family Services (DCFS) provided services to the family in an effort to address the concerns raised, and the case proceeded successfully, with the court terminating its jurisdiction in 2011.

¶4 In or about 2011, Father relocated to Louisiana, while Mother and the Children remained in Utah. At some point thereafter, Mother asked Father to take over caring for the Children for a while. The Children lived with Father in Louisiana for several years,[1] until Father relocated to Colorado in July 2016 to seek better work opportunities. At that point, Father asked Mother to take the Children back for the following school year; his expectation was that they would return to his care after the school year ended. But over the ensuing months, communication between Father and Mother deteriorated; after that, Father had no in-person contact with the Children and only sporadic telephonic communication, and the Children did not ever return to Father's care. Eventually, Father returned to Louisiana.

¶5 In January 2019, Mother contacted Father and asked him to come to Utah from Louisiana to pick up C.S., who was

---

1. The juvenile court found that the Children were with Father in Louisiana "for two years," but Father testified that the Children were with him in Louisiana for five years, from when the Children were "2 and 4 up until" they were "7 and 9 years old."

apparently exhibiting discipline problems. Father obliged, and arranged to rent a car and take time off work to drive to Utah. When he arrived, however, Mother refused to allow Father to take either of the Children, and he returned to Louisiana without them.

¶6 A few months later, in April 2019, DCFS filed a petition for protective supervision, alleging that Mother had "substance abuse issues" and asking the juvenile court to find the Children abused and neglected by Mother and dependent as to Father. At a pretrial hearing held soon after the filing of the petition, Father appeared telephonically and voluntarily waived his right to counsel. He entered a general denial as to any allegations against him and requested another hearing on the matter. The court scheduled another pretrial hearing for the following month, and explained to all parties, including Father, that they had the right to an attorney at future hearings, even if they could not afford one on their own; the court also provided all parties with instructions on how to apply for a court-appointed attorney.

¶7 The following month, after Mother tested positive for illegal drugs and indicated her desire to enter an inpatient treatment program, DCFS filed a motion asking the court to authorize DCFS to remove the Children from Mother's home. A shelter hearing was held on May 9, 2019 to address the motion; Father again appeared telephonically and again waived his right to counsel. At the hearing, the court found that removal of the Children from Mother's home was in their best interest, and transferred temporary custody and guardianship to DCFS. After Father asked the court "about having the [C]hildren placed with him," the court ordered DCFS to "investigate the safety and appropriateness of the non-custodial parent or relatives to assume custody" of the Children.

¶8 Upon Mother's loss of custody, DCFS initially placed the Children with Mother's ex-husband (Stepfather). It soon became

apparent, however, that C.S. required more one-on-one attention than Stepfather could provide, so DCFS then placed C.S. with several foster families, each for a short time. Eventually, DCFS placed C.S. with his elementary school principal (Foster Mother) and her husband (collectively, Foster Parents), who signed up to become foster parents specifically for C.S; he has lived with Foster Parents ever since. K.S. remained with Stepfather for a time, then was placed with a foster family for a short period after Stepfather relocated, but in 2020 she went to live with Stepfather in his new location. As of the time of trial, C.S. was living with Foster Parents and K.S. was living with Stepfather; both Children were doing well in their respective placements and were proceeding toward adoption with those families.

¶9     On May 16, 2019, one week after the shelter hearing, the court held another hearing at which Father appeared telephonically. The court again explained to Father "the process to request a public defender," and emailed Father the relevant request form, which Father acknowledged receiving. The court ordered Mother and Father to participate in a mediation in early June 2019, but Father did not appear at the scheduled mediation. The court also scheduled another hearing for June 20, 2019, but Father did not appear at that hearing either, despite the court's attempt to reach him via telephone. At the June 20 hearing, the court adjudicated the Children neglected by Mother.

¶10     Based on Father's failure to appear at both the mediation and the June 20 hearing, and based on the fact that he had failed to answer the State's petition, the State filed a motion asking the court to "enter a default" against Father. The court granted the motion and later entered a default judgment against Father.[2]

---

2. In the default judgment, the court stated that the Children were "neglected . . . by reason of the fault or habits of" Father. In its

(continued…)

¶11 The court held a review hearing in October 2019, and Father appeared by phone. During the hearing, Father "expressed a desire" to have the Children placed with him in Louisiana. Mother objected, asserting that the Children were "afraid" of Father,[3] and the court ordered "an expedited ICPC[4] with

petition, however, DCFS had alleged only that the Children were dependent as to Father. The default judgment should therefore have stated that the Children were dependent as to Father, not that Father neglected them. While unfortunate, this mistake does not appear to have had any specific negative consequences for Father; indeed, even a dependency finding would have been sufficient to bring the Children within the jurisdiction of the juvenile court. *See* Utah Code Ann. § 80-1-102(17) (LexisNexis Supp. 2021) (stating that a "dependent child" is "a child who is without proper care through no fault of the child's parent, guardian, or custodian"); *id.* § 80-3-405(2)(a)(i) ("The juvenile court may vest custody of an abused, neglected, or dependent minor in the division or any other appropriate person."). And although the juvenile court later found, after the termination trial, that Father had neglected the Children, that finding was based on its determination that Father had abandoned the Children, and not on its earlier erroneous default judgment.

3. K.S. later testified that Father was physically abusive when the Children lived with him; in particular, she stated that he would "hit [the Children] with a belt" and would make them "kneel down on dry rice for about four hours or so." She also testified that she gets "really scared" when she is with him "to a point where [her] stomach starts hurting" and she "start[s] shaking."

4. The abbreviation "ICPC" refers to the Interstate Compact on Placement with Children, an interstate agreement that has been adopted by all fifty states. *See* Utah Code Ann. § 62A-4a-701 (LexisNexis 2018). The ICPC allows child welfare agencies from

(continued…)

Louisiana to allow DCFS to . . . determine if [placing the Children with Father] is a proper placement."

¶12    In January 2020, while DCFS was "working on the ICPC," the court held another review hearing, but Father again failed to appear, and did not answer the phone when the court called him. Father did, however, appear at a subsequent hearing in early June 2020 (held via videoconference), and for the first time claimed to have filled out and sent in the indigency forms requesting appointment of a public defender. The court indicated that it had not yet received the completed forms, but in light of Father's request for counsel—and at the urging of appointed counsel for Mother—the court went ahead and appointed an attorney to represent him anyway, at least on a temporary basis. From that point forward, Father has always been represented by counsel in this matter.

¶13    At another hearing a week later, Father's attorney appeared but Father did not, despite the court's attempt to contact him. The court indicated, however, that it had received the completed indigency forms from Father, and it appointed him counsel on a permanent basis.

¶14    At a continued permanency hearing in late June 2020, Father appeared via videoconference, as did his attorney. During the hearing, the court inquired of Father as to why he had not remained in contact with the Children, and Father indicated that it was "because of his work"; the court found that though Father "did work on the oil rigs," he had "the opportunity to contact [the Children] and did not."

¶15    On June 30, 2020, Louisiana child welfare authorities sent a letter to DCFS "in reference to" DCFS's "inquiry regarding a

different states to cooperate regarding placement of children across state lines. What the juvenile court meant when it ordered "an expedited ICPC" is discussed below, in Part II.

home study request" for Father. Louisiana authorities indicated that they had made six unsuccessful attempts to contact Father before finally reaching him on the seventh attempt and scheduling an appointment for an interview. On the date of the scheduled interview, however, Father called and canceled, apparently "because of work," and the interview was rescheduled. On the rescheduled date, Louisiana authorities went to Father's home, but he told them that he was about to move and that he would not be living there when the Children might possibly be staying with him, so the authorities "did not complete a home assessment on that home." Father told the Louisiana authorities that he would call them with his new address, but he never did, and the authorities' subsequent "attempts to reach him were futile." Some five months later, Father finally contacted them and told them his phone had been broken. Louisiana authorities closed the case due to Father "being noncompliant."

¶16 Later that summer, DCFS filed a petition seeking termination of both Mother's and Father's parental rights as to the Children. With regard to Father, DCFS alleged the existence of several grounds for termination, including abandonment, and asserted that it was in the Children's best interest that his parental rights be terminated. At a subsequent hearing, the court changed the primary permanency goal from reunification to adoption, with the intent that Stepfather would adopt K.S. and Foster Parents would adopt C.S. Another mediation was scheduled, at which Father did appear, but it was unsuccessful.

¶17 A few weeks later, after another hearing and at the recommendation of the guardian ad litem, the court concluded that any subsequent contact between Father and the Children should be conducted either through the Children's therapists or the guardian ad litem. The court also imposed discovery and disclosure orders as the parties prepared for a trial on DCFS's termination petition.

¶18    In November 2020, Father filed a motion asking the court to authorize a team of independent expert therapists, paid for by DCFS or the county, to assess Father's relationship with the Children and issue a report. DCFS did not oppose the motion, and the court subsequently granted it. It then took several months to select the experts, who were officially appointed in March 2021, and the evaluation was finally scheduled to take place in April 2021. But Father failed to appear for the evaluation, and it was therefore not completed as scheduled. Father asked the court to postpone the trial dates so that the assessment could be rescheduled, but the court denied that request.

¶19    The court held a three-day trial in June 2021 to consider the State's termination petition. At trial, the court heard testimony from the Children—ages 13 and 12 at the time—both of whom stated that they were happy and thriving in their respective placements and that neither had any desire to live with (or even see) Father again. The State presented testimony from the Children's therapist, who provided a summary of each child's respective behavioral issues and detailed the Children's shared anxiety regarding Father. The State also offered testimony from a DCFS caseworker who testified that Father had consistently failed to communicate with her.

¶20    For his part, Father introduced testimony from his fiancée and also testified on his own behalf. Both averred that Father was an active and attentive father who had attempted to maintain contact with the Children throughout their entire lives. Father acknowledged, however, that he had failed to maintain communication with the Children for at least one six-month period, attributing that failure in part to a broken cell phone. Lastly, the court heard testimony from Stepfather and Foster Mother, who testified that the Children were doing well and were relieved to no longer be forced to communicate with their parents. Both also testified that they would happily pursue adoption if given the opportunity. Mother did not appear at trial.

¶21　After taking the matter under advisement, the court issued a written decision terminating the parental rights of both Mother and Father.[5] The court first found that DCFS had made a "fair and serious attempt" to reunify the Children with their parents. Next, the court found at least three separate statutory grounds—including abandonment—for termination of Father's parental rights. Finally, the court concluded that termination of Father's parental rights was in the Children's best interest and was strictly necessary. In assessing the Children's best interest, the court found that the Children were both doing significantly better in their respective placements than they had been doing in the custody of either parent; the court additionally noted that the Children had formed meaningful relationships with their foster families and that disrupting those relationships would be detrimental to their well-being. The court also emphasized the fact that the Children expressed a strong desire to be adopted and no desire to have any kind of a relationship with Father.

## ISSUES AND STANDARDS OF REVIEW

¶22　Father appeals the juvenile court's order terminating his parental rights, and asks us to consider three issues. First, he alleges that the court "violated [his] right to counsel by having repeated hearings where Father was unrepresented." If this issue were preserved for our review, we would review it for correctness. *See State v. King*, 2018 UT App 190, ¶ 10, 437 P.3d 425 ("Whether a defendant has the right to counsel during a particular phase of [the] proceedings is a constitutional issue that presents a question of law that we review for correctness."). But Father acknowledges that this issue is not preserved for appellate review, and asks us to apply plain error review. "To demonstrate plain

---

5. Mother is not a participant in this appeal, and the court's order terminating her rights is not at issue here.

error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (quotation simplified).[6]

¶23 Second, Father contends that the juvenile court erred by determining that it could not place the Children with him in Louisiana absent an ICPC review by Louisiana authorities. As with the first issue, Father acknowledges that he did not object to the court's action and that his objection is therefore unpreserved, but nevertheless asks us to review the issue for plain error.

¶24 Third, Father assails the merits of the juvenile court's determination to terminate his parental rights. He contends that there exists insufficient evidence to support the court's determinations that there are statutory grounds for termination and that termination was in the Children's best interest. "The ultimate conclusion that a parent is unfit or that other grounds for termination have been established is a legal question, but such

---

6. This court recently held that plain error review is generally not available to civil litigants. *See Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 44. We left open the possibility, however, that plain error review may still be available in certain types of civil cases that involve significant fundamental rights, including cases—like this one—that involve "termination of parental rights." *Id.* ¶ 11 n.10. Because it remains unsettled whether plain error review is available in cases like this one, and because neither party asks us to conclude that plain error review is unavailable here, we proceed to analyze Father's claims, where appropriate, for plain error. *See, e.g.*, *Miner v. Miner*, 2021 UT App 77, ¶ 11 n.3, 496 P.3d 242 (stating that, where the issue remains unsettled, and where "both parties appear to assume the propriety of plain error review" in the case at hand, the court would apply plain error review where appropriate).

decisions rely heavily on the juvenile court's assessment and weighing of the facts in any given case." *In re J.M.*, 2020 UT App 52, ¶ 22, 463 P.3d 66 (quotation simplified). We thus afford a "high degree of deference to a juvenile court's decision with regard to the existence of statutory grounds, and overturn it only when the result is against the clear weight of the evidence or leaves us with a firm and definite conviction that a mistake has been made." *Id.* (quotation simplified). And we apply this same deferential standard to a juvenile court's decision that termination of a parent's rights is in a child's best interest. *See In re E.R.*, 2021 UT 36, ¶¶ 7, 12, 496 P.3d 58.

ANALYSIS

I

¶25 Father first argues that the juvenile court violated his right to counsel by holding hearings while Father was unrepresented. We find Father's argument unpersuasive, because Father waived his right to counsel at the first two hearings, and was appointed counsel as soon as he indicated that he desired a court-appointed attorney and that he had completed the indigency request form. Under these circumstances, the juvenile court did not err.

¶26 Father certainly had the right to be represented by counsel from the outset of these proceedings. *See* Utah Code Ann. § 80-3-104(2)(a) (LexisNexis Supp. 2021) ("The parent or guardian of a minor who is the subject of an abuse, neglect, or dependency petition has the right to be represented by counsel, and to present evidence, at each hearing.").[7] As a parent facing termination of his parental rights, Father had the right to be represented by a court-

---

7. Some of the statutes cited in this section have been subject to recent revision. Where the recent revisions have not materially changed the statutes as concerns this case, we cite the current version of the statutes for convenience.

appointed attorney, at no cost to himself, if he did "not knowingly and voluntarily waive the right to counsel" and was found to be "indigent." *See id.* § 78B-22-201(1)-(2) (LexisNexis Supp. 2021); *see also* Utah R. Juv. P. 35(a) ("At the commencement of the initial pre-trial hearing, if the parent . . . appears pro se, the court shall advise the parent . . . of the right to the assistance of counsel at all stages of the proceeding including the right to apply to the court for the appointment of counsel if indigent.").

¶27    At the first two hearings at which Father telephonically appeared, he voluntarily waived his right to counsel, and he does not now, on appeal, claim otherwise. At the first hearing, the juvenile court explained to Father that he had the right to an attorney at that hearing and at all future hearings, even if he could not afford one, and gave him instructions as to how to apply for a court-appointed attorney if he later changed his mind and decided he wanted one. The court reiterated these instructions at Father's third hearing, this time also emailing Father the relevant request form, which Father acknowledged receiving.[8] The court

---

8. The record submitted to us does not contain transcripts of these early hearings; the information included here comes from the court's minute entries summarizing events at the hearings. Those minute entries indicate that Father's waiver of counsel was "knowing and willing." Because we do not have access to the transcripts of these hearings, we must presume the regularity of the proceedings occurring during those hearings, including a presumption that the waiver of counsel described in the minute entries was knowing and voluntary. *See Capital One Bank (USA), NA v. Roberts*, 2014 UT App 120, ¶ 2, 327 P.3d 1226 (per curiam) ("In the absence of the transcript on appeal, the reviewing court presumes the regularity of the proceedings below."). Nevertheless, we take this opportunity to remind juvenile courts of the importance of taking appropriate steps, including proactive steps, to ensure that all parents facing termination of their

(continued…)

then scheduled another hearing, but Father did not appear at that hearing or at a scheduled mediation, and the court then (at the State's request) entered default against Father.

¶28 Father's next telephonic appearance was at a hearing a few months later, where he reiterated his request that the Children be placed with him following their removal from Mother's custody, and where the court ordered "an expedited ICPC." The record contains no indication that Father requested a court-appointed lawyer at this hearing. And Father did not appear at the next hearing scheduled in the case.

¶29 Father did, however, appear at a subsequent hearing in June 2020 (held via videoconference), and for the first time requested an attorney and claimed to have filled out and sent in the indigency forms requesting appointment of a public defender. Although the court had not yet received those forms, it went ahead and appointed an attorney to represent him anyway, at least on a temporary basis. From that point forward, Father has always been represented by counsel in this matter.

¶30 Father's chief complaint, in this regard, is that the juvenile court, "instead of insisting on [Father] filling out the [request form]," "should have taken brief testimony from Father on the record to determine if he would qualify for counsel." We see two problems with this argument.

---

parental rights have the opportunity to be represented by counsel, and that all waivers of the right to counsel are knowing and voluntary. *See State v. Frampton*, 737 P.2d 183, 187 (Utah 1987) (stating that "it is the trial court's duty to determine if [a defendant's] waiver is a voluntary one which is knowingly and intelligently made," and that "a colloquy on the record between the court and the accused is the preferred method of ascertaining the validity of a waiver").

¶31 First, at his first two appearances, Father expressly and voluntarily waived his right to an attorney. Individuals have a constitutional right to represent themselves if they so choose, and this right is one that courts must respect. *See State v. Frampton*, 737 P.2d 183, 187 (Utah 1987) (citing *Faretta v. California*, 422 U.S. 806 (1975), and stating that "the sixth amendment to the United States Constitution . . . implicitly guarantees" the right to self-representation, and that a person's "right to conduct his own defense must be respected and guarded by the courts in harmony with the right to assistance of counsel, also guaranteed by the sixth amendment"). In the face of Father's expressed desire to represent himself, and his apparent voluntary waiver of his right to counsel, the juvenile court did not commit error by declining to take testimony from Father to assess his level of indigency.[9] And the moment the court perceived that Father wished to withdraw his waiver and request counsel, the court appointed counsel to represent him, even before it had received the request form for the appointment of counsel.

¶32 Second, when a parent requests an attorney, the applicable rule of procedure gives juvenile courts a choice regarding how that request should be handled. *See* Utah R. Juv. P. 35(a) ("If appointment of counsel is requested, the court may proceed to examine the parent . . . concerning eligibility for appointed counsel or the court may continue the pre-trial hearing and require the parent . . . to file an affidavit or other evidence as deemed appropriate by the court for a determination as to

---

9. In this regard, the case at hand is materially distinguishable from *Buck v. Arkansas Department of Human Services*, 548 S.W.3d 231 (Ark. Ct. App. 2018), a case Father relies on to support his argument. In *Buck*, the parent never voluntarily waived his right to counsel. *Id.* at 233–34. And there is no indication that the parent in *Buck* was ever even informed that he had the right to counsel, or that he was given an opportunity to request the appointment of counsel. *Id.*

eligibility for appointed counsel."). Certainly, the court could have done as Father now advocates: it could have proceeded to examine Father regarding his financial circumstances, during the hearing and on the record. *See id.* But the rule affords the court another option: to require the parent to fill out the form. *Id.* And again, Father overlooks the fact that the court appointed him an attorney as soon as Father's request for one was made clear, even *before* the court had received the form; nothing in the record indicates that the juvenile court was waiting for the completed form—as opposed to waiting for Father to actually request counsel—before appointing counsel.

¶33     Under the circumstances presented here, we perceive no error—let alone an obvious one—in the juvenile court's handling of Father's right to and request for counsel. On this basis, we reject Father's first claim.

II

¶34     Father next takes issue with the juvenile court's refusal to immediately place the Children with him once the court removed them from Mother's custody. In particular, Father complains about the court's decision to order "an expedited ICPC" before making any decision about placing the Children with him, asserting that the ICPC has no application in a situation in which a court is considering placing a child with a noncustodial parent who lives in another state. Even assuming, for purposes of our analysis, that Father's interpretation of the ICPC is the better one, we nevertheless find his arguments unpersuasive.

¶35     The ICPC—the Interstate Compact on Placement of Children—is a uniform law, adopted in all fifty states, that sets rules for coordinating the placement of children across state lines. *See* Utah Code Ann. § 62A-4a-701 (LexisNexis 2018). As relevant here, the ICPC mandates that no state "shall send . . . any child for placement in foster care or as a preliminary to a possible adoption unless" certain conditions are met, including a requirement that

"the appropriate public authorities in the receiving state" provide written notification to the sending state that "the proposed placement does not appear to be contrary to the interests of the child." *Id.* § 62A-4a-701 art. III(1), (2)(f). Father argues—with some force—that the plain language of the ICPC indicates that its requirements apply only to placements for "foster care" or for purposes of facilitating an "adoption," and not to placements with a noncustodial parent. Several jurisdictions have interpreted the ICPC in this manner. *See, e.g.*, *McComb v. Wambaugh*, 934 F.2d 474, 482 (3d Cir. 1991) (concluding that "the [ICPC] does not apply when a child is returned by the sending state to a natural parent residing in another state"); *Arkansas Dep't of Human Services v. Huff*, 65 S.W.3d 880, 888 (Ark. 2002) ("Based upon . . . the plain language of the statute, we hold that the [ICPC], read as a whole, was intended only to govern placing children in substitute arrangements for parental care, such as foster care or adoption."); *In re C.B.*, 116 Cal. Rptr. 3d 294, 299 (Ct. App. 2010) ("In our view, the notice provisions do not apply to a placement with a parent."); *In re Emoni W.*, 48 A.3d 1, 6 (Conn. 2012) (agreeing with the lower court that the ICPC "does not apply to out-of-state noncustodial parents"); *In re Alexis O.*, 959 A.2d 176, 182 (N.H. 2008) (concluding that the ICPC "was not intended to apply when a child is returned by the sending state to a natural parent residing in another state" (quotation simplified)); *In re D.F.-M.*, 236 P.3d 961, 966 (Wash. Ct. App. 2010) ("We are persuaded that the ICPC governs only the placement of children in substitute arrangements for parental care.").

¶36   Several other jurisdictions, by contrast, have interpreted the ICPC to apply to placements with noncustodial parents. *See, e.g.*, *Arizona Dep't of Econ. Sec. v. Stanford*, 323 P.3d 760, 764 (Ariz. Ct. App. 2014) (concluding that the ICPC applies "to placement with parents and relatives" (quotation simplified)); *Green v. Division of Family Services*, 864 A.2d 921, 926 (Del. 2004) (stating that the ICPC "governs the children's placement with [noncustodial parents]"); *Department of Children & Families v. C.T.*,

144 So. 3d 684, 686 (Fla. Dist. Ct. App. 2014) (interpreting the ICPC to apply "when a court exercises its jurisdiction to *place* a child with an out-of-state parent"); *State ex rel. Juvenile Dep't v. Smith*, 811 P.2d 145, 147 n.4 (Or. Ct. App. 1991) (concluding that the ICPC "*does* apply to a child who is sent to another state for placement with parents or relatives," as long as "someone *other* than a parent or relative makes the placement"); *see also In re adoption of Warren*, 693 N.E.2d 1021, 1024 (Mass. App. Ct. 1998) (applying the ICPC to a noncustodial parent based on a specific Massachusetts regulation). Some of these courts relied on a "regulation" issued in connection with the ICPC that provides that "[p]lacement of a child requires compliance with the [ICPC] if such placement is made under one of the following four types of placement categories," including "[p]lacements with parents and relatives." *See* American Public Human Services Ass'n, *ICPC Regulations*, Regulation 3, https://aphsa.org/OE/AAICPC/ICPC_Regulations.aspx [https://perma.cc/DA9W-Z4KM] [hereinafter ICPC Regulations]; *see also, e.g.*, *Stanford*, 323 P.3d at 764; *Green*, 864 A.2d at 927–28. Father criticizes these cases on the ground that some of them rely on the text of a regulation rather than on the text of the ICPC itself.

¶37    We acknowledge Father's point that there exists a sharp split of authority among courts that have considered the issue, and we recognize that Utah's appellate courts, at some point, may need to weigh in on this question. But in our view, this case does not present an appropriate opportunity for us to do so because, even if we presume for purposes of our analysis that Father's interpretation of the ICPC—that it has no application to placements with noncustodial parents—is the better one, Father still cannot prevail here, for several reasons.

¶38    First, as already noted, *see supra* ¶ 23, Father did not lodge any objection to the juvenile court's decision to request "an expedited ICPC," and therefore Father did not preserve this issue for our review. As a consequence, we review this issue only for

plain error, a standard that requires Father to demonstrate not only error but *obvious* error on the part of the court. *See State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443. A court's error is "not plain where there is no settled appellate law to guide [it]." *See State v. Ross*, 951 P.2d 236, 239 (Utah Ct. App. 1997); *see also State v. Dean*, 2004 UT 63, ¶ 16, 95 P.3d 276 (noting that, to establish obvious error, a party "must show that the law governing the error was clear at the time the alleged error was made"). And we have recently held that, where there is no Utah appellate law on the question and there exists a genuine "split of authority" in other jurisdictions on the question, the law is "far from plainly settled, and therefore any alleged error in the court's analysis was not obvious." *See Freight Tec Mgmt. Group Inc. v. Chemex Inc.*, 2021 UT App 92, ¶¶ 40–41, 44, 499 P.3d 894 (quotation simplified). Here, no Utah appellate court has yet offered an interpretation of the ICPC in this context, and courts in other jurisdictions are sharply divided. Under these circumstances, even if we assume that the juvenile court should have espoused an interpretation of the ICPC in line with Father's, its decision to implicitly adopt the opposite interpretation cannot fairly be characterized as obvious error.

¶39 Second, Utah's shelter statute does not permit the juvenile court—without any investigation whatsoever—to immediately place children removed from a custodial parent's home with a noncustodial parent. *See* Utah Code Ann. § 80-3-302(2) (LexisNexis Supp. 2021). That statute does instruct juvenile courts, after removing a child from a custodial parent's care, to "determine whether there is another natural parent with whom the child was not residing at the time . . . who desires to assume custody of the child," and to "place the child with that parent unless the juvenile court finds that the placement would be unsafe or otherwise detrimental to the child." *Id.* § 80-3-302(2)(a), (b). But before making any such placement, the court "shall make a specific finding regarding the fitness" of the noncustodial parent and "the safety and appropriateness of the placement." *Id.* § 80-3-

302(2)(c)(i). In the course of making that finding, the court "shall, at a minimum, order [DCFS] to visit the [noncustodial] parent's home" and conduct appropriate "background check[s]" of the noncustodial parent. *Id.* § 80-3-302(2)(c)(ii). And the court "may order . . . any further investigation" beyond those minimum requirements. *Id.* § 80-3-302(2)(c)(iii).

¶40     In this case, because Father resided in Louisiana, it was impractical for the court to order DCFS to visit Father's home, as the court surely would have done if Father lived in Utah. Instead, the court needed to come up with some mechanism for inspection of Father's home in Louisiana. The court, after discussion at the October 2019 hearing, ordered "an expedited ICPC with Louisiana to allow DCFS to . . . determine if [placing the Children with Father was] a proper placement." No party objected, at the time, to the court's decision.

¶41     Father now assails that decision, interpreting it as an order requiring a "home study" pursuant to the ICPC, and asserting that such home studies often take far too long and that the court should have come up with a different and more expeditious way to satisfy the home-inspection requirements of Utah's shelter statute. In particular, Father asserts that instead of ordering a home study, the court should have "request[ed] a courtesy check of [Father's] home," a measure Father contends is "outside of the ICPC." Father asserts that this "would have permitted a quick evaluation of Father's home," and would potentially have allowed the court to more quickly assess the safety and propriety of placing the Children with him.

¶42     We assume, for purposes of our analysis, that Father correctly interprets the juvenile court's order for "an expedited ICPC" as an order for an ICPC home study. Neither the State nor the guardian ad litem takes issue with this characterization, and the Louisiana child welfare authorities appear to have interpreted the request made to them as asking for an ICPC home study. But

Father does not point to any evidence in the record, or to any legal authority, indicating that a non-ICPC-related "courtesy check" would have been appreciably quicker than the "expedited" home study the court apparently ordered.[10] In addition, if a court orders a courtesy check (as opposed to a home study), "the responsibility for credentials and quality of the 'courtesy check' rests directly with the sending court/agency" and does not come accompanied by "the protection of the ICPC home study process." *See* ICPC Regulations, Regulation 3, para. 3(b). Father makes no effort to persuade us that the juvenile court, at the time it ordered the "expedited ICPC," had ready access to reputable non-ICPC-related agencies, companies, or individuals in Louisiana who could have conducted a "courtesy check." On this record, we are hard-pressed to conclude that the juvenile court erred at all by selecting an "expedited" ICPC home study over a courtesy check, let alone that the court committed an obvious error that it was obligated to correct sua sponte.

¶43 Moreover, Father fails to account for his own role in delaying the ICPC home study. Louisiana child welfare officials, acting pursuant to the ICPC, made six unsuccessful efforts to contact Father and schedule an interview, before finally connecting with him on their seventh attempt. On the date of the scheduled interview, however, Father called and rescheduled. Later, on the rescheduled date, Louisiana authorities went to Father's home to conduct the inspection, but he told them that he would not be living in that home much longer, so Louisiana authorities "did not complete a home assessment on that home." Father told the authorities that he would call them with his new address, but he made no contact with them for some five months;

---

10. ICPC regulations indicate that home studies are "to be completed within sixty (60) calendar days." *See* ICPC Regulations, Regulation 2, para. 7. Father offers no information indicating how long home studies actually take, or comparing the typical duration of home studies with courtesy checks.

Louisiana officials attempted to contact Father during this time but were unable to do so. Louisiana authorities eventually closed the case due to Father "being noncompliant." Thus, even if we were to assume that the juvenile court committed obvious error by ordering an ICPC home study instead of a "courtesy check," Father has not met his burden, on this record, of demonstrating that he was prejudiced by any error.

¶44    Finally, Father fails to grapple with the fact that, at least as to K.S., he was never adjudicated as the legal father. Thus, even if we were to assume that Father's interpretation of the ICPC—that it does not apply to placements with noncustodial parents—was the correct one, the court would still have been on completely solid ground to apply the ICPC to its decision as to whether to place K.S. with Father.

¶45    For all of these reasons, Father has not carried his burden of demonstrating that the juvenile court plainly erred by ordering "an expedited ICPC" before placing the Children with Father in Louisiana.

III

¶46    Father's final argument is that there existed insufficient evidence to support the juvenile court's decision to terminate his parental rights. Before terminating a parent's rights, a court must engage in a two-part analysis. First, the court must find that at least one statutory ground for termination is present; second, the court must conclude that termination of the parent's rights is in the best interest of the affected children. *See In re B.T.B.*, 2020 UT 60, ¶¶ 19–20, 472 P.3d 827. The juvenile court engaged in that two-part analysis here, finding several separate statutory grounds for terminating Father's rights, and concluding that termination was in the Children's best interest. Father challenges both parts of the court's analysis, and we discuss each one, in turn.

A

¶47    In this case, the juvenile court found that at least three[11] separate statutory grounds existed for terminating Father's parental rights: abandonment, neglect, and the fact that Father had made only "token efforts to support or communicate with" the Children. The presence of any one statutory ground "is sufficient to fulfill the first element of the termination test." *See In re J.M.*, 2020 UT App 52, ¶ 30, 463 P.3d 66. Thus, we will affirm the juvenile court's determination regarding statutory grounds if we conclude that the court's determination as to any one of them is not subject to reversal. *Id.* In this case, we focus on abandonment, and conclude that the juvenile court did not err in determining that Father had abandoned the Children.

¶48    Our supreme court has outlined a two-part test for abandonment: "First, the petitioner must demonstrate that the respondent parent has engaged in conduct that implies a conscious disregard for his or her parental obligations. Second, the petitioner must show that the respondent parent's conduct led to the destruction of the parent-child relationship." *In re T.E.*, 2011 UT 51, ¶ 20, 266 P.3d 739. This judicial test is "supplemented" by a statute stating that it is "prima facie evidence of abandonment" if a parent "fail[s] to communicate with the child by mail, telephone, or otherwise for six months" or "fail[s] to . . . [show] the normal interest of a natural parent, without just cause." *See id.* ¶ 21 (quotation simplified); Utah Code Ann. § 80-4-302(1)(b)–(c)

---

11. The court also found that the Children's "parents" failed to remedy the circumstances that caused the Children to be removed from Mother's care. It is difficult to see how this ground would apply to Father, and we therefore interpret that part of the court's ruling as inapplicable to Father.

(LexisNexis Supp. 2021).[12] "[B]y establishing prima facie evidence of abandonment, a petitioner creates a presumption that the respondent parent has abandoned the child." *In re T.E.*, 2011 UT 51, ¶ 21. Under these legal principles, if the petitioner demonstrates that the parent failed to communicate with the child for any six-month period, a presumption is created both (a) that the parent "consciously disregarded . . . his parental obligations" and (b) that the parent's "conduct has led to the destruction of the parent-child relationship." *Id.* Once this presumption has been established, the burden shifts to the parent to rebut it, which the parent may attempt to do by presenting evidence "indicating that [the parent] did not consciously disregard . . . parental obligations or that [the] conduct did not lead to the destruction of the parent-child relationship." *See id.* ¶¶ 21–22. After considering the parent's rebuttal evidence, the juvenile court must determine whether "the petitioner has established abandonment by clear and convincing evidence." *Id.* ¶ 23.

¶49 Here, the juvenile court found prima facie evidence of abandonment for two reasons. First, it found that Father had "failed to communicate in any way with" the Children "for six months or more." Father did not contest at trial, and does not contest now, that there was in fact at least one six-month period

---

12. The statute also indicates that "it is prima facie evidence of abandonment that the parent . . . [,] although having legal custody of the child, [has] surrendered physical custody of the child, and for a period of six months following the surrender [has] not manifested to the child or to the person having physical custody of the child a firm intention to resume physical custody or to make arrangements for the care of the child." Utah Code Ann. § 80-4-302(1)(a) (LexisNexis Supp. 2021). The juvenile court did not mention this additional ground in its findings.

during which he had no communication with the Children.[13] Indeed, K.S.—who was 13 at the time of trial—testified that she had not seen Father since she was seven years old, and that she did not remember the last time she spoke with him. C.S. testified similarly, alleging that he had not seen Father in years, and that he "never" had phone calls or video chats with him. Second, the court found that Father had "not shown the normal interest of a natural parent without just cause." On these bases, the court found that the State had established a prima facie case of abandonment, and we agree with the juvenile court that clear and convincing evidence supported this conclusion.

¶50     Father attempted to rebut the abandonment presumption at trial by attributing his inattention to a broken cell phone. On appeal, Father again directs our attention to the broken phone, which he asserts should "serve to interrupt" the six-month period of no communication, and he asserts that he was otherwise unfamiliar with how to participate in a child welfare case. He also notes that, when Mother asked him to, he drove to Utah in an effort to resume custody of the Children. The juvenile court found Father's testimony on many of these issues to be "unreliable and not credible," and found his rebuttal evidence unpersuasive, noting that Father's phone was broken for no more than two months, that "there were other means at his disposal" by which he could have contacted the court or DCFS to "arrange visitation," and that a parent exhibiting normal interest in his children would have availed himself of one or more of these other means. We discern nothing erroneous about this conclusion, and we agree with the juvenile court that clear and convincing evidence

---

13. The juvenile court did not specifically set forth the dates of the six-month period in question, but there is evidence indicating that Father had no contact with the Children from December 2019 to June 2020, a period that does not include any of the time following the court's order that any contact between Father and the Children be had, if at all, through DCFS or therapists.

supported its determination that Father had consciously disregarded his parental obligations and that Father's conduct contributed significantly to the evident deterioration of the relationship between Father and the Children.

¶51 Accordingly, we reject Father's challenge to the juvenile court's determination that at least one statutory ground for terminating Father's rights was present here. *See In re J.M.*, 2020 UT App 52, ¶ 30.

B

¶52 The second part of the termination test requires a court to determine whether termination of the parent's rights is in the best interest of the affected children, an inquiry that includes consideration of whether termination is "strictly necessary to promote the [children's] welfare and best interest." *See In re B.T.B.*, 2020 UT 60, ¶ 76, 472 P.3d 827. The juvenile court concluded that termination of Father's rights was in the Children's best interest and was strictly necessary to promote that interest. In this case, there exists sufficient support in the record to sustain the juvenile court's determination.

¶53 "The 'best interest' test is broad, and is intended as a holistic examination of all the relevant circumstances that might affect a child's situation." *In re H.F.*, 2019 UT App 204, ¶ 14, 455 P.3d 1098 (quotation simplified). This broad examination "should be undertaken from the child's point of view, not the parent's." *See In re B.T.B.*, 2020 UT 60, ¶ 63 (quotation simplified). In connection with this inquiry, a court should "consider whether something short of termination would serve the child's welfare and best interest," *id.* ¶ 71, and should terminate a parent's rights only after considering the "legislatively mandated position that wherever possible, family life should be strengthened and preserved," and only after determining that "a different option is in the child's best interest and that termination is strictly necessary to facilitate that option," *id.* ¶ 66 (quotation simplified).

¶54 The juvenile court followed that process here, and its conclusions are supported by ample evidence in the record. The court first found that the Children were "doing much better in their respective placements" than they ever had in Father's custody, and that the Children adamantly desired to sever contact with Father so that they could be adopted. As noted, both Children expressed a desire, during their trial testimony, to be adopted by their foster families and not have a relationship with Father. K.S. even went so far as to state that, if forced to live with Father, she would run away. The court additionally found that both Children had developed lasting, meaningful relationships with their foster families and that disrupting those placements would be detrimental to their well-being. And Father did not suggest at trial, and does not suggest now, that there is another kinship placement or guardianship situation that might serve the Children's needs as well as termination. In this situation, we do not consider the court's decision to be "against the clear weight of the evidence," nor are we left "with a firm and definite conviction that a mistake has been made." *See In re E.R.*, 2021 UT 36, ¶ 7, 496 P.3d 58 (quotation simplified). Accordingly, we reject Father's challenge to the court's best interest determination.

CONCLUSION

¶55 The juvenile court did not err, let alone plainly, in the way it handled Father's initial waiver of the right to counsel and eventual request for counsel. The court also did not plainly err in ordering "an expedited ICPC" home study before considering whether to place the Children with Father. And we reject Father's challenges to the juvenile court's conclusions that statutory grounds for termination of Father's rights were present, and that termination was in the best interest of the Children.

¶56 Affirmed.

————————