**2023 UT 18**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH
*Respondent,*

*v.*

DOUGLAS JACK CARTER,
*Petitioner.*

No. 20220297
Heard March 8, 2023
Filed August 17, 2023

On Certiorari to the Utah Court of Appeals

Fifth District, Cedar City
The Honorable Matthew L. Bell
No. 181500817

Attorneys:

Sean D. Reyes, Att'y Gen., Thomas Brunker, Deputy Solic. Gen., Salt Lake City, Chad E. Dotson, Iron County, Cedar City, for respondent

Emily Adams, Freyja Johnson, Cherise Bacalski, Bountiful, for petitioner

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN, JUSTICE POHLMAN, and JUDGE JOHNSON joined.

Having recused herself, JUSTICE HAGEN does not participate herein; DISTRICT COURT JUDGE KRISTINE E. JOHNSON sat.

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

### INTRODUCTION

¶1 A jury convicted Douglas Carter of aggravated arson. Carter did not dispute that he had started the fire that burned down the empty house that once belonged to his grandparents. Carter's entire defense turned on whether he had set fire to a "habitable structure" —

a distinction that meant the difference between a conviction for arson and aggravated arson.

¶2 Carter argued to the court of appeals that he had been denied the effective counsel the Sixth Amendment guarantees. *See State v. Carter*, 2022 UT App 9, ¶¶ 1, 16, 504 P.3d 179. Carter claimed that his trial counsel should have moved for a directed verdict because, under a correct reading of the aggravated arson statute, there was insufficient evidence before the jury that he had set fire to a habitable structure. *Id.* ¶ 29. He also argued that his counsel should have objected to the testimony of an expert who opined that the structure was habitable. *Id.* ¶ 25. A divided court of appeals affirmed his conviction. *Id.* ¶ 35. We affirm.

## BACKGROUND

¶3 A house belonging to Douglas Carter's relative (Relative) caught fire twice in one week. The house was unoccupied at the time of the fires and had been for quite some time. In the year leading up to the fires, Relative had undertaken home-improvement projects. Although Relative kept the place connected to utilities, he stayed at a hotel when he worked on the house.

¶4 The house first caught fire in October 2018. That fire burned part of the house's exterior and extended to the roofline. Carter was not charged for this first fire.

¶5 Three days later, the house caught fire again. This time it suffered extensive damage. Suspicion soon landed on Carter, who eventually confessed to the police that he had started the second fire.

¶6 The State charged Carter with aggravated arson, a first-degree felony. The aggravated arson statute required the State to prove that Carter had, "by means of fire or explosives," "intentionally and unlawfully damage[d] . . . a habitable structure." UTAH CODE § 76-6-103(2)(a). The statute in place at the time defined a "habitable structure" as "any building, vehicle, trailer, railway car, aircraft, or watercraft used for lodging or assembling persons or conducting business whether a person is actually present or not." UTAH CODE § 76-6-101(1)(b) (2022).[1]

---

[1] The Utah Legislature amended the statute in 2023 to define "habitable structure" as "a structure that has the apparent purpose of or is used for lodging or assembling persons or conducting business whether a person is actually present or not." UTAH CODE § 76-6-101(1)(d) (2023).

¶7  At trial, the State called a fire marshal as an expert witness. The State asked if, in the marshal's "expert opinion," the house was "a habitable structure." The marshal replied, "Yes." Carter's counsel did not object.

¶8 Carter's counsel cross-examined the fire marshal. Counsel asked the marshal what expertise he possessed that would allow him to opine on whether a structure was habitable. The marshal replied that it was based on "a matter of experience over the years of . . . knowing . . . what people are willing to live in." Carter's counsel also asked the marshal why he thought the structure, which had already suffered one fire, was habitable. The marshal allowed that "after the second fire, it would have probably been less habitable" but then opined that he had "seen structures that were considerably more damaged" than the house, "that people have moved back into."

¶9 Outside the jury's presence, the State, Carter, and the court discussed how to instruct the jury on the definition of "habitable." Carter wanted an instruction that would explain: "The focus of the definition of 'Habitable Structure' is on the actual use of the particular structure, not on the usual use of similar types of structures." *State v. Carter*, 2022 UT App 9, ¶ 7, 504 P.3d 179.

¶10 Carter justified the proposed instruction with caselaw he argued required the State to show that the structure "was actually being used as a home." The district court disagreed and told Carter that, the way it read the statute, "[y]ou don't have to show it's being actually lived in. It's a habitable structure."

¶11 The district court also rejected the State's proposed instruction, which would have told the jury that "habitable structure includes any dwelling house, whether occupied, unoccupied, or vacant." The court informed counsel that it would instruct the jury by giving it, without further explanation, the statutory language defining habitable structure. And the court indicated that it would allow counsel to argue to the jury what that language meant.

¶12  In closing arguments, each side argued its interpretation of the statute. The State told the jury that the house "was classified as a habitable structure by . . . an expert witness," that "[t]he primary purpose of this type of structure is lodging," that "[t]he law does not require that somebody be living there full time and that they just happen to not be home," and, finally, that, "if a business, if a trailer, if a railway car, a watercraft, or an aircraft can constitute a habitable structure under the law, then this home surely constituted a habitable structure."

¶13 Carter's counsel asked the jury to "focus on the word . . . 'used,'" and to ask themselves: "what's the actual use of this property, this structure, at this time?" Counsel also addressed the fire marshal's testimony and said that his testimony related to the condition— rather than the use—of the house. He then emphasized that "[w]e're not talking about condition. This statute is talking about use. . . . [T]he condition of the property is irrelevant. It's the use of the property. What was the property being used for?"

¶14 The jury convicted Carter of aggravated arson. Carter appealed, arguing that his counsel was ineffective for not objecting to the fire marshal's testimony that the house was habitable. *Id.* ¶ 16. Carter also claimed that his counsel provided ineffective assistance when he failed to move for a directed verdict. *Id.*

¶15 The court of appeals upheld Carter's conviction. *Id.* ¶ 1. Carter argued that the State's expert had offered "an impermissible legal conclusion" when he opined that the house was habitable. *Id.* ¶ 25. The court did not directly address whether the opinion fell outside the permissible bounds of expert testimony. *Id.* ¶ 25 n.6. But it concluded that Carter's counsel was not ineffective for not objecting even if the opinion was improper. *Id.* ¶¶ 25–28.

¶16 The court of appeals concluded that reasonable counsel "could have decided to cross-examine the fire marshal in this situation rather than object and move for the testimony to be stricken." *Id.* ¶ 25. The court noted that Carter's counsel had cross-examined the expert about his opinion and elicited testimony that the marshal was not opining that the house met the statutory definition of "habitable structure." *Id.* ¶ 26. The court also pointed to Carter's counsel's closing argument wherein he emphasized to the jury that "all that mattered" under the statute "was whether the house was being lived in at the time of the second fire, which the fire marshal said was not the case." *Id.* ¶ 28.

¶17 Carter's second argument centered on the proper interpretation of the statute defining "habitable structure" and whether his attorney was ineffective for not moving for a directed verdict. *Id.* ¶ 29. Carter argued that "objectively reasonable trial counsel would have moved for a directed verdict when the State presented no evidence of ongoing use of the house because ongoing use is what the statutory definition of habitable structure requires." *Id.* (cleaned up). The majority opinion rejected this argument for two reasons.

¶18 It first reasoned that Carter could establish neither deficient performance nor prejudice for his ineffective assistance claim because a motion for directed verdict "had no chance of success." *Id.* ¶ 30 (cleaned up). The majority opinion concluded that the directed verdict motion would have been futile because it was based on a theory about the way the statute should be interpreted and "the district court had already indicated its disagreement with that theory." *Id.* ¶ 31.

¶19 The majority next reasoned that, because the district court had ruled that the statute did not require the State to show that the house was "actually lived in," Carter's counsel could have reasonably perceived a risk in raising the issue anew. *Id.* ¶ 33. More specifically, the court opined that "counsel could have reasonably seen a potential risk that in the discussion that would follow such a motion, the court might be prompted to curb counsel's ability to make his argument to the jury that the house had to be in continual use to be considered habitable." *Id.*

¶20 The majority opinion drew both a concurring and dissenting opinion. Then-Judge Hagen dissented from the conclusion that counsel's decision to not file a directed verdict motion was objectively reasonable. *Id.* ¶ 60 (Hagen, J., dissenting). Judge Hagen took particular issue with the majority's determination that because the district court had expressed an opinion on the correct reading of the statute—a reading at odds with Carter's—it would have been futile for Carter's counsel to bring the motion. *See id.* ¶¶ 62–69. Judge Hagen argued that the court "cannot use a motion's futility as shorthand for reasonable performance without examining the merits of the motion." *Id.* ¶ 66. Moreover, Judge Hagen did "not view the district court's jury instruction decision as a de facto rejection of Carter's argument." *Id.* ¶ 72. She argued that the record did not suggest that trial counsel "risked losing his chance to argue the theory to the jury if he moved for a directed verdict on the same grounds." *Id.* ¶ 76.

¶21 Judge Tenney "join[ed] the majority opinion in full" and wrote separately to respond to the dissent. *See id.* ¶ 36 (Tenney, J., concurring). Judge Tenney was moved by the majority opinion's take on the futility question because "the district court had already been presented with" Carter's interpretation of habitability "when the defense requested a jury instruction that was based on it," and the court "expressed its clear disagreement with it." *Id.* ¶ 43. Judge Tenney allowed that examining the merits of an unfiled motion "would be one way for us to analyze futility in a case," but he rejected Judge Hagen's assertion that it was the only way. *Id.* ¶¶ 51–52.

¶22 Judge Tenney noted that though the district court "had already expressed its own disagreement with the defense's proposed interpretation," it "nevertheless still decided to allow defense counsel to make this argument to the jury." *Id.* ¶ 55. Judge Tenney described this as a "delicate and necessary gain." *Id.* ¶ 57. And he reasoned that counsel was not ineffective because counsel "could reasonably decide to leave well enough alone, accept the court's invitation to take this case to the jury, and push for an acquittal there." *Id.* ¶ 58.

## ISSUES AND STANDARD OF REVIEW

¶23  Carter raises two arguments. Carter first argues that the court of appeals majority erred when it held that his counsel's failure to file a directed verdict motion did not constitute ineffective assistance.

¶24  Carter next argues that the court of appeals erred when it held that his counsel did not render ineffective assistance when he did not object to an expert's testimony that the house was "habitable."

¶25 The question of whether an attorney's ineffective representation deprived a defendant of his Sixth Amendment right to counsel presents a question of law that we review for correctness. *State v. Scott*, 2020 UT 13, ¶ 27, 462 P.3d 350.

## ANALYSIS

### I. THE COURT OF APPEALS MAJORITY CORRECTLY DETERMINED THAT CARTER'S COUNSEL'S DECISION NOT TO MOVE FOR A DIRECTED VERDICT DID NOT CONSTITUTE INEFFECTIVE ASSISTANCE

¶26 Carter first argues that his counsel denied him the representation the Sixth Amendment guarantees because counsel forwent a meritorious directed verdict motion. The test for ineffective assistance of counsel comes from *Strickland v. Washington*, 466 U.S. 668 (1984).

¶27 *Strickland* requires a defendant to demonstrate that (1) counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense. *Id.* at 687–88. It presents a deliberately stringent standard that requires us to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Even if a defendant can meet that burden, the standard requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶28 Carter's first ineffective assistance argument focuses on what he contends is the correct interpretation of the aggravated arson statute. And, more specifically, the correct interpretation of the word "habitable."

¶29 In a nutshell, "arson" becomes "aggravated arson" if a person uses fire or explosives to "intentionally and unlawfully damage[] . . . a habitable structure." UTAH CODE § 76-6-103(2)(a). At the time of the fire, the statute defined a "habitable structure" as "any building, vehicle, trailer, railway car, aircraft, or watercraft used for lodging or assembling persons or conducting business whether a person is actually present or not." UTAH CODE § 76-6-101(1)(b) (2022).[2]

¶30 Whether the statute required the burned structure to be lived in or just capable of being lived in became a hot topic at trial. The issue arose in the context of how to instruct the jury. Carter's counsel pressed for an instruction that explained: "The focus of the definition of 'Habitable Structure' is on the actual use of the particular structure, not on the usual use of similar types of structures." *State v. Carter*, 2022 UT App 9, ¶ 7, 504 P.3d 179.

¶31 The State, for its part, wanted to instruct the jury that "habitable structure includes any dwelling house, whether occupied, unoccupied, or vacant." *Id.* ¶ 8.

¶32 The district court did not select either of the proffered instructions. Instead, the court told counsel that it would give the jury the statutory language defining "habitable structure," without additional explanation. The court also indicated that it would allow each side to argue to the jury its view of what that language meant.[3]

¶33 During this discussion, the district court appeared to show some skepticism about Carter's counsel's statutory interpretation. The court said: "You don't have to show it's being actually lived in. It's a habitable structure." It is against this backdrop that Carter's counsel

---

[2] The statute has been amended in a way that may, in the future, foreclose the argument Carter made to the district court. *See supra* ¶ 6 n.1.

[3] Neither party challenges the district court's decision to let the parties argue the meaning of the law to the jury. Because of that, we will simply emphasize that it "is the prerogative of the court, not counsel, to instruct the jury as to the applicable law." *State v. Smith*, 675 P.2d 521, 526 (Utah 1983).

decided to not file a motion for directed verdict premised on the way he read the statute.

¶34 Carter argued to the court of appeals that this constituted ineffective assistance of counsel because "objectively reasonable trial counsel would have moved for a directed verdict when the State presented no evidence of ongoing use of the house because ongoing use is what the statutory definition of habitable structure requires." *Id.* ¶ 29 (cleaned up).

¶35 A divided court of appeals rejected this argument. Judge Orme authored the majority opinion. That opinion relied on court of appeals caselaw declaring that a "futile motion necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make a motion that would not have been granted, and forgoing such a motion does not prejudice the outcome." *Id.* ¶ 30 (cleaned up). The majority decided Carter's directed verdict motion would have been futile because "it would have been abundantly clear to counsel that because the court had previously denied an instruction to the jury directing that ongoing use was required, it would not have granted a directed verdict motion premised on the State's inability to prove ongoing use." *Id.* ¶ 31.

¶36 The majority also concluded that reasonable counsel could have decided to forgo the directed verdict motion because of a "potential risk that . . . the court might be prompted to curb counsel's ability to make his argument to the jury that the house had to be in continual use to be considered habitable." *Id.* ¶ 33.

¶37 Then-Judge Hagen dissented from that decision. The dissent criticized the majority for deciding that the motion was futile without analyzing the merits of the hypothetical directed verdict motion. *Id.* ¶¶ 62–66 (Hagen, J., dissenting). The dissent reiterated the concurrence's point that futility "is not a standalone third element" of the well-known two-part *Strickland* test. *Id.* ¶ 63 (quoting *id.* ¶ 47 (Tenney, J., concurring)). Instead, futility is "a shorthand descriptor" "for why one of the two ineffective assistance elements was not established in a particular case." *Id.* (cleaned up).

¶38 Judge Hagen also noted that the State had not "addressed the merits" of Carter's statutory interpretation argument. *Id.* ¶ 69. The dissent reasoned that when an "appellee fails to present us with any argument, an appellant need only establish a prima facie showing of a plausible basis for reversal." *Id.* (cleaned up). The dissent concluded that Carter had made a *prima facie* showing that Carter was entitled to

a directed verdict and that counsel's failure to move for a directed verdict was unreasonable under the circumstances. *Id.* ¶¶ 69, 78, 79, 81.

¶39 Judge Tenney penned a concurring opinion. The concurrence acknowledged that "the dissent is correct that our futility cases have commonly turned on our own assessment of the missing motion's merits." *Id.* ¶ 41 (Tenney, J., concurring). But the concurrence regarded this as "a feature of how these cases usually come up" and not "a prescriptive rule." *Id.* ¶ 42.

¶40 The concurrence saw Carter's case as "atypical" because "the district court had already been presented with [Carter's] very interpretation" and "expressed its clear disagreement with it." *Id.* ¶ 43. In this situation, the concurrence did not see the need to assess the motion's strength, because it reasoned that reasonable counsel could, based upon the district court's apparent distaste for the argument, decide to not file a meritorious motion that was destined for failure. *Id.* ¶ 50.

¶41 Before we turn to the merits of Carter's challenge, we want to spend a moment discussing the court of appeals' excellent work in this case. We appreciate the careful thought that went into each of the three opinions. Each offers a view of what futility could mean and how a court should employ the futility analysis.

¶42 Such a careful explication of futility gives us hope that we might be able to have nice things in our jurisprudence. We have, at times, been forced to prune back shorthand phraseology and analytical tools when we have seen that they threatened to overtake the test they described. In *State v. Gallegos*, for example, we observed that the shorthand "a conceivable basis for trial counsel's decision" was causing us to develop "a tendency to ask whether there is a conceivable tactical basis for an attorney's decision as a proxy for analyzing whether a trial attorney's challenged decision is objectively reasonable." 2020 UT 19, ¶¶ 53, 55, 463 P.3d 641. In *Gallegos*, we noted that "[l]anguage matters and, over time, even small variations can take on lives of their own and distort the analysis." *Id.* ¶ 58. And this has caused us to sometimes reiterate that while shorthand phrases can be helpful, we need to make sure that they don't supplant the test.

¶43 Here, the court of appeals' careful discussion and acknowledgment that futility was a shorthand reference and not an addition to, or a restatement of, the *Strickland* test goes a long way towards keeping the analytical focus where it belongs: *Strickland*'s two-part inquiry. Even if the court of appeals could not agree on what

it meant for a motion to be futile, it recognized that futility could not be allowed to supplant the test the United States Supreme Court gave us in *Strickland*.

¶44 That is important because, while futility can sometimes be a helpful way to describe why an attorney's decision was reasonable or why a defendant was not prejudiced by a failure to file a losing motion, it is not a key that unlocks every door. We can envision instances where failure to file even a losing motion—to ensure an issue is preserved, for example—might constitute unreasonable performance. And we don't want to allow otherwise-helpful shorthand to short-circuit thoughtful analysis.

¶45 Carter argues that it was objectively unreasonable for his attorney to fail to file a directed verdict motion. *Strickland* instructs that an assessment of objective reasonability requires the reviewing court to "reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. In other words, we "judge the reasonableness of counsel's challenged conduct[,] . . . viewed as of the time of counsel's conduct." *Id.* at 690.

¶46 As such, we look at what the record tells us about what the world looked like when Carter's counsel forwent the directed verdict motion. And in this case that requires us, as then-Judge Hagen observed, to factor in the strength of the motion Carter faults his counsel for not filing.

¶47 At the close of evidence, Carter's counsel was faced with a mixed bag of a case. Carter's counsel had an argument about what the aggravated arson statute required for conviction. But he did not have a published case that dictated the interpretation he advocated. Even assuming that he was interpreting the statute correctly, all he had at that point was his personal belief that he was correctly interpreting an uninterpreted statute.[4] In other words, Carter's counsel had a

---

[4] We realize that it may be disappointing that we assume the merits of the argument rather than analyze the extensive arguments that Carter's appellate counsel has given the court about the meaning of "habitable structure"; arguments that include an intricate corpus linguistics analysis of the word "habitable." As much as we appreciate the time and energy that went into that analysis, we cannot escape the fact that the Legislature has amended the statute in a fashion that would make our analysis inapplicable to future cases. Rather than render an opinion (and possibly competing opinions) on the meaning

(continued . . .)

potentially meritorious argument but, without controlling precedent, no guarantee of success.

¶48 Carter's counsel also knew that he had presented his interpretation to the district court and that the district court had not bought what he was selling. The court had, however, left the door open for Carter to present his interpretation directly to the jury.

¶49 Against this backdrop, if Carter's counsel were to game out the potential outcomes of filing the directed verdict motion, he could reasonably expect one of three outcomes. First, the district court could reverse course on the interpretation question and grant the motion. This would, of course, have been an immediate, ideal result for Carter. Second, the court could deny the motion but still allow Carter to argue his interpretation to the jury. This could be almost immediately good for Carter as he could prevail in front of the jury. Or it could be eventually good for Carter because, even if the jury did not accept his argument about the meaning of "habitability," he would have ensured that he had preserved the argument for appeal. Third, the court could deny the directed verdict motion and, because the motion forced the court to revisit the statutory interpretation, double down on the way it read the statute and take away Carter's argument concerning habitability. In this scenario, Carter's counsel loses his only path to a favorable jury verdict and must hope for an appellate decision endorsing his statutory interpretation for his client to prevail. In all of these scenarios, trial counsel would need to factor into the calculus that although he had great confidence in his statutory interpretation argument, he did not have a published opinion to rely on.

¶50 Presented with this choice, we cannot say that it was professionally unreasonable for Carter's counsel to decide that his best shot was to take what the district court had already given him: a chance to argue his interpretation to the jury. This is especially so when reasonable counsel would have at least entertained the concern that moving for a directed verdict could cause him to lose the basis of his defense. At that point in the trial, Carter's counsel had presented his statutory interpretation argument to the court and was better positioned than we are to predict whether this would prompt the court to revisit its earlier decision. Carter's counsel had also observed the jury respond to testimony and other evidence and could better

_of statutory text that no longer exists, we will assume, without deciding, that Carter's interpretation is correct._

assess whether he preferred arguing his case to this jury now or his statutory interpretation to the appellate courts later.

¶51  *Strickland* requires that we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. We can certainly see reasonable counsel filing the motion in this circumstance, but we cannot say that a reasonable attorney could not make the choice that Carter's counsel did. The court of appeals majority did not err when it reached that conclusion.[5]

## II. THE COURT OF APPEALS CORRECTLY CONCLUDED THAT COUNSEL WAS NOT INEFFECTIVE WHEN HE FAILED TO OBJECT TO THE FIRE MARSHAL'S TESTIMONY

¶52  Carter next argues that the court of appeals erred when it concluded that Carter's counsel did not perform deficiently when he failed to object to the fire marshal's expert testimony that the house was a "habitable structure."

¶53  Carter argued to the court of appeals that the fire marshal's opinion contained "an impermissible legal conclusion" that the Utah Rules of Evidence forbid. *State v. Carter*, 2022 UT App 9, ¶ 25 & n.6, 504 P.3d 179. Carter averred that "failing to object to expert testimony improperly opining on the only legal conclusion that matters is not a defensible course of action." *Id.* ¶ 25 (cleaned up).

¶54  The court of appeals assumed, without deciding, that the objection to the fire marshal's testimony would have been sustained.[6]

---

[5] We hasten to emphasize the unique nature of each *Strickland* inquiry. This opinion should not be read to hold that it is always professionally reasonable to forgo a motion when the district court has expressed hostility to the motion's underlying argument or when there is no controlling precedent to ensure success. The lesson we hope to reinforce is that *Strickland* can be intensely fact-specific and requires an examination of—as *Strickland* instructs—all the circumstances that surrounded counsel's decision. Indeed, *Strickland* reminds us that "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland*, 466 U.S. at 693.

[6] We will likewise assume, without deciding, that the expert testimony was improper. But we note that it can sometimes be difficult to discern the line we have drawn between permissible and

(continued . . .)

*Id.* ¶ 25 n.6. But it nevertheless concluded that Carter's counsel had not performed deficiently, because "counsel is not required to correct every error that might have occurred at trial." *Id.* ¶ 25 (cleaned up).

¶55 The court of appeals noted that the challenged expert testimony came at the end of the fire marshal's direct examination and that Carter's counsel began his cross-examination by attacking that opinion. *Id.* ¶ 26. The court of appeals further concluded that Carter's counsel "was able to elicit testimony from the fire marshal suggesting he meant only that the house was capable of being lived in and was not opining" about the meaning of the statute. *Id.* This, combined with Carter's counsel's affirmative use in his closing argument of the fire marshal's testimony that no one was living in the house at the time of the fire, led the court of appeals to conclude that "'considering all the circumstances,' we cannot say that 'counsel's acts or omissions were objectively unreasonable' in relying on cross-examination of the fire marshal to attempt to establish the defense's theory of the case rather than objecting outright." *Id.* ¶ 28 (quoting *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350).

¶56 Carter argues this was error because cross-examination was not a reasonable alternative to objecting to the testimony's admission. Carter argues that in "context, correcting the testimony was sufficiently important that counsel's failure to correct—leaving that damning evidence on the table—was objectively unreasonable." Carter lists eleven reasons that he argues demonstrate that cross-examination—in lieu of objecting—was objectively unreasonable.

---

impermissible expert testimony that touches on legal standards. For example, in *State v. Larsen*, we concluded that a district court did not abuse its discretion when it allowed a securities fraud expert to testify that certain information would have been material to investors while at the same time acknowledging that the expert "certainly should have avoided employing the specific term 'material'" because that was the language the statute used. 865 P.2d 1355, 1362 (Utah 1993). The court of appeals appears to have interpreted *Larsen* to mean that an expert can testify that information is "material" if the expert does not say the words "material *under Utah law*" or "material *under the Utah Uniform Securities Act*." *See State v. Tenney*, 913 P.2d 750, 756 (Utah Ct. App. 1996). So, while here we will assume that an objection to the fire marshal's testimony would have been sustained, there is ample reason to believe that we could do a better job of drawing the line between admissible and inadmissible expert testimony in a future case or by rule amendment.

None of these convince us that the court of appeals erred when it concluded that reasonable counsel could have preferred cross-examination to objection.

¶57 To start, three of the eleven reasons simply reiterate Carter's contention that the testimony was improper.[7] The court of appeals assumed that the testimony would have been struck had an objection been made. As such, these assertions do not shed light on whether the court of appeals erred when it decided it was not objectively unreasonable to decide to address the improper testimony through cross-examination instead of by objection.

¶58 Another of Carter's reasons fails to convince us because it takes an after-the-fact look at whether counsel's gambit paid off rather than provide the at-the-time-the-decision-was-made examination that *Strickland* requires. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) (holding that a court must "evaluate the conduct from counsel's perspective at the time"). Carter argues that counsel's cross-examination bolstered rather than undercut the expert's impermissible testimony. Reasonable minds may differ on whether Carter's counsel executed the cross-examination in the way he might have hoped. But the fact that cross-examination might not have panned out the way Carter's counsel wanted does not tell us that the decision to cross-examine rather than object was unreasonable at the time he made it.

¶59 Three more of Carter's reasons appear to reference other, later, decisions that Carter's counsel made that are not themselves the subject of Carter's ineffective assistance challenge. For example, Carter complains that the jury was not properly instructed on expert testimony. But this is not part of the ineffective assistance challenge that Carter lodged in front of the court of appeals. Carter similarly laments that the State referenced the fire marshal's testimony in closing argument and that counsel did not tell the jury in his closing argument that the fire marshal was not allowed to define "habitability." But, again, Carter did not focus his ineffective assistance claim on a failure to object to the State's use of the testimony in closing, or a failure to argue the proper scope of expert testimony to the jury. While these decisions may say something about whether

---

[7] These are: "the testimony was inadmissible"; "counsel knew that the expert's testimony was inadmissible ultimate-issue testimony"; and "the expert's testimony bypassed both the State's and the defense's interpretation of the statute" "[because it] did, in fact, go to the ultimate issue."

the decision to choose cross-examination over objection was reasonable, Carter uses them to engage in the after-the-fact second-guessing that *Strickland* forbids.

¶60  This leaves just four proffered reasons that speak to the core question *Strickland* requires us to ask. Carter first argues that the rationale his counsel offered to the court for not objecting was not part of a rational strategy. This argument does not work under *Strickland* because it attempts to improperly shift the inquiry from an objective examination of what reasonable counsel would do to a subjective assessment of what Carter's counsel thought he was doing. *See State v. Gallegos*, 2020 UT 19, ¶ 47, 463 P.3d 641 (upholding the court of appeals' decision to not grant a rule 23B remand to allow the defendant to put on the record counsel's subjective reasons for not calling a witness because the "*Strickland* inquiry is objective, not subjective").

¶61 We largely agree with Carter's other three points—the habitability question was Carter's entire defense, any evidence of habitability presented to the jury undercut that defense, and cross-examination would not instruct the jury to ignore the improper testimony. Habitability was, indeed, the crux of Carter's defense, and evidence that did not support his interpretation of "habitable" was harmful. Objectively reasonable counsel would have to include those considerations in the calculus. But recognizing the truth of those assertions does not answer whether it was objectively unreasonable for counsel to decide that he could advance his client's interests by forgoing the objection and relying on cross-examination to make his case to the jury.

¶62 We, like the court of appeals, cannot say that it was objectively unreasonable to forgo the objection to the fire marshal's testimony. As the court of appeals noted, the questionable opinion came in at the end of the State's direct examination. Carter's counsel could have reasonably thought that he would try and get a concession from the fire marshal on what he meant by "habitability" because these points would be more impactful for the jurors if they heard them from the mouth of the State's expert. Carter's counsel could reason that he would be able to get the fire marshal to say, directly after the objectionable testimony, that his opinion was based on his experience of "what people are willing to live in" and not because anyone was living in the house. This is, in fact, what Carter's trial counsel did. This was consistent with counsel's reading of what the statute required and the theme he later developed in his closing argument.

¶63 Although reasonable minds could differ on what the best approach would have been, we cannot say that, on this record, the court of appeals erred when it concluded that reasonable counsel could decide to challenge the expert's opinion through cross-examination rather than object to the testimony. Carter has not convinced us that the court of appeals incorrectly concluded that it was reasonable for counsel to decide to cross-examine the fire marshal instead of objecting to his testimony that the house was "habitable."

## CONCLUSION

¶64 Carter contends that the court of appeals majority erred when it concluded that his counsel had not rendered ineffective assistance by deciding to forgo a motion for directed verdict. We agree with the court of appeals that reasonable counsel, presented with the palette of options Carter's counsel faced, could have decided to not file the motion. Carter also argues that the court of appeals erred when it decided that Carter's counsel was not ineffective for cross-examining an expert who offered an improper opinion, instead of objecting to that testimony. We affirm the court of appeals' decision that this did not deprive Carter of the counsel the Sixth Amendment guarantees.

———————