*This opinion is subject to revision before final publication in the Pacific Reporter*

**2026 UT 2**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH, in the interest of B.G.,
a person under eighteen years of age.

N.G.,
*Appellant,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20240852
Heard November 5, 2025
Filed February 20, 2026

On Certification from the Court of Appeals

Second District Juvenile Court, Weber County
The Honorable Jeffrey J. Noland
No. 1214206

Attorneys*:

Sara Pfrommer, Emily Adams, Anna Grigsby, Bountiful,
for appellant

Derek E. Brown, Att'y Gen., Deborah A. Wood, John M. Peterson,
Asst. Att'ys Gen., Salt Lake City, for appellee

Martha Pierce, Alisha Giles, Heath Haacke, Salt Lake City,
Guardian ad Litem

---

* Additional attorneys: Erin Byington, Jason B. Richards, Alexandra Mareschal, Logan, for *amicus curiae* Utah Family Defenders Association, in support of appellant.

JUSTICE HAGEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, JUSTICE PETERSEN,
ASSOCIATE CHIEF JUSTICE POHLMAN, and JUDGE MONTAGUE joined.

Due to his retirement, JUSTICE PEARCE did not participate herein;
DISTRICT COURT JUDGE AMANDA N. MONTAGUE sat.

JUSTICE NIELSEN became a member of the Court on
November 19, 2025, after oral argument in this matter,
and accordingly did not participate

———————

JUSTICE HAGEN, opinion of the Court:

## INTRODUCTION

¶1    When a child is removed from a custodial parent by the Utah Division of Child and Family Services (DCFS), a juvenile court must determine whether there is another suitable parent who desires to take custody of the child. But before placing the child with the other parent, the court must make findings about "the fitness of the parent" and "the safety and appropriateness of the placement," which, at minimum, requires DCFS to conduct a home visit. UTAH CODE § 80-3-302(2)(c)(i)–(ii).

¶2    In this case, the child was removed from the mother's care in Utah, and the father who sought custody lived in Georgia. The court ordered DCFS to ask Georgia officials to conduct the home visit pursuant to the Interstate Compact on the Placement of Children (ICPC). Georgia officials twice attempted to conduct the home visit but were unable to do so because the father did not have a stable residence. The court ultimately found that the child could not be safely returned to the father and terminated his parental rights.

¶3    On appeal, the father argues that his appointed counsel should have objected to using the ICPC process. Whether the ICPC applies to an out-of-state placement with a natural parent is an open question. But because the issue was not preserved, we can reach it only if an exception to preservation applies. Although the father invokes the ineffective assistance of counsel exception, he has not shown that it was objectively unreasonable for his appointed counsel to acquiesce to using the ICPC process rather than suggesting potential alternatives for conducting the required home visit. Therefore, we affirm.

## BACKGROUND

### A. Interstate Compact on the Placement of Children

¶4 When DCFS takes a child into protective custody, the juvenile court must "hold a shelter hearing to determine the temporary custody of a child within 72 hours." UTAH CODE § 80-3-301(1). At that hearing, the court must determine "whether there is another parent with whom the child was not residing at the time the events or conditions that brought the child within the juvenile court's jurisdiction occurred, who desires to assume custody of the child." *Id.* § 80-3-302(2)(a). But before the court can place the child with such a parent, it must "make a specific finding regarding the fitness of the parent . . . and the safety and appropriateness of the placement." *Id.* § 80-3-302(2)(c)(i). Before making that finding, the court "shall, at a minimum, order the division to visit the parent's home," run the parent's criminal history, and check for any previous reports of abuse or neglect by the parent. *Id.* § 80-3-302(2)(c)(ii). The court may also order DCFS to conduct "any further investigation regarding the safety and appropriateness of the placement." *Id.* § 80-3-302(2)(c)(iii).

¶5 When the parent seeking temporary custody lives outside of Utah, conducting the required investigation presents logistical challenges. Juvenile courts in Utah commonly use the ICPC process to determine the safety and appropriateness of child placement with a parent across state lines. *See, e.g.*, *In re K.S.*, 2022 UT App 68, ¶ 11, 512 P.3d 497.

¶6 The ICPC is a uniform law adopted in all fifty states and establishes the process "for coordinating the placement of children across state lines." *Id.* ¶ 35. The purpose of the ICPC is to ensure children "receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide necessary and desirable care." UTAH CODE § 80-2-905(I)(1).

¶7 The parties and the juvenile court refer to "an ICPC" as shorthand for the investigation the ICPC requires before a child is placed in another state. According to testimony presented in this case, a DCFS caseworker initiates the ICPC process by submitting a request with the receiving state. From there, the receiving state assigns an official to complete a "home study." Generally, the process requires a background screening of all adults living in the home. The official in the receiving state visits the home in person to "assess[] the home for appropriateness [for] the child, [and] any

safety concerns." The official also interviews the placement adult and reviews his or her health and financial situation to ensure that the placement adult "is going to be able to care for the child adequately" and "to meet the needs of [the] child." Once a placement is approved, the receiving state will also "provide courtesy supervision, meaning someone would go out to the home once a month to meet with the child and the [adult] to see how things are going" and report back to the caseworker from the sending state.

### B. Facts of Father's Case and Juvenile Court Proceedings

¶8 Appellant N.G. (Father) married E.T. (Mother), and together they had B.G. (Child) in July 2019. The family lived with Father's mother (Grandmother) in Georgia. Father and Mother's relationship was plagued by violent domestic disputes, which often involved Grandmother and occurred while Child was in the home. One such dispute led to Mother calling the police, resulting in Father's arrest. Because Father is a non-U.S. citizen, his arrest led to U.S. Immigration and Customs Enforcement detaining him for fourteen months.

¶9 Following his release, Father reunited with Mother and Child for a short period, this time living with Mother's family. But problems continued. As a result, Father left Mother and Child. After the separation, Father had various living arrangements with friends and family, and at one point he was living temporarily in a hotel. The record includes conflicting accounts as to Father's attempts to remain in contact with Mother and Child and as to Mother's purported efforts to keep Father from doing so. But it is undisputed that Father did not see Child for two years, from June 2021 until June 2023.

¶10 Meanwhile, Mother became pregnant with E.T. (Infant), who was born in May 2022.[1] At some point, Mother went to Utah based on an agreement with an adoption agency to place Infant for adoption. When Mother came to Utah, she brought Child with her; Father was unaware of the move. Mother ultimately decided

---

[1] Father was initially presumed to be the biological father of both Child and Infant at the outset of these proceedings because he and Mother were still married when Infant was born. A paternity test later determined that Father is the biological father of Child, but not of Infant. Thus, the juvenile court's determination regarding Father's parental rights applied only as to Child.

against adoption and, shortly after Infant's birth, experienced a mental health crisis resulting in her hospitalization. DCFS took protective custody of Child and Infant. DCFS filed a petition for custody and legal guardianship in juvenile court.

¶11 The court held a shelter hearing where it found that the "initial removal of the children from the home was proper and in the children's best interest." The court further concluded that the "continued removal of the children is necessary and in the children's best interest." Shortly after the shelter hearing, the court held an adjudication hearing where it concluded that Child was dependent as to Mother under Utah Code section 80-1-102(21) because Child was without care through no fault of Mother. As to Father, the court found that the child was neglected because Child had been abandoned by Father within the meaning of Utah Code section 80-1-102(58)(a)(i). Father did not participate in these hearings because he claims he "was not aware that . . . [Child was] in [Utah] state custody."

¶12 In February 2023, Father filed a paternity motion seeking to establish paternity over Child on an expedited basis and to obtain visitation rights. The court held a hearing where Father made his first appearance in the proceedings in early March 2023, and the court advised Father of his right to counsel. The court then issued an order where it indicated that the "primary permanency goal for the children is reunification with a concurrent goal of adoption." The court also concluded that it was in the best interest of Child to remain in the custody and guardianship of DCFS. Because Father lived in Georgia, the court ordered DCFS to "begin an ICPC for [Father]" before Child could return to live with Father.

¶13 Shortly after Father's initial appearance, the court appointed him counsel. Later that same month, the court proceeded with another adjudication hearing. Father asked the court to revisit its earlier finding of neglect through abandonment because Mother had denied him access to Child. DCFS filed an amended petition alleging that Child was dependent as to Father, and Father stipulated to an adjudication of dependency. The court agreed and found that the alleged facts did not establish that Father failed to provide for Child. Accordingly, the court revised its findings and adjudicated Child dependent as to Father, rather than neglected. The court ordered Child to remain in DCFS custody and maintained the permanency goal of reunification.

¶14 A couple weeks later, DCFS initiated an ICPC with the state of Georgia, where Father was living. Georgia officials attempted to complete the ICPC home study. But at the time, Father lived in a hotel and "report[ed] that he was moving in August . . . 2023 and that he couldn't complete the home study evaluation . . . until he moved in his new residence." As a result, Georgia officials sent a letter to DCFS in May 2023, indicating that Father "does not wish to start the assessment process until he is moved and settled." Georgia officials informed Father that they could "complete a new [ICPC] referral once he [was] moved and settled."

¶15 In June 2023, DCFS sent a second ICPC request to Georgia. Around the same time, the juvenile court held a review hearing as to Father, where Father's counsel indicated that "it [was] important to get the ICPC moving forward."

¶16 The court then held a permanency hearing in August 2023, where DCFS asked to extend the reunification period for ninety days because Father and Mother were making progress in their reunification services. Father also indicated that "he just moved" and was "waiting for [the] paperwork to go through on the ICPC."

¶17 Following the ninety-day period, the court reconvened the permanency hearing (October 2023 Hearing). Sometime prior, Georgia had denied the second ICPC because "the home study could not be completed due to [Father] . . . not having a stable residence." At the October 2023 Hearing, Father's counsel acknowledged the difficulty in completing the ICPC. But he argued that the main issue was Father living in a hotel, which was only a problem for Georgia officials. He claimed that if Father had been living in a hotel in Utah it would be "a very different conversation." Nevertheless, Father's counsel represented to the court that Father was going to move to new housing within a few weeks, and once that occurred, Father could complete the ICPC.

¶18 In response, DCFS argued that services for Father should be terminated because the second ICPC failed due to Father's unstable housing. In the months prior to the October 2023 Hearing, a DCFS caseworker had corresponded with Georgia officials regarding the ICPC process. The caseworker indicated that Father "seemed a little bit worried about [the ICPC]." The caseworker stressed that they needed Father's updated "address first because" otherwise Georgia officials could not "complete the home study, and it [would] just come back as denied."

¶19 After the October 2023 Hearing, the court issued a written ruling concluding that Child could "not be safely returned to the custody" of Father (or Mother). The court thus terminated services for Father (and Mother) and changed the permanency goal for Child to adoption.

¶20 DCFS then filed a petition to terminate Father's parental rights. At a pretrial hearing in January 2024 (January 2024 Hearing), Father's counsel acknowledged that the main issue with the failed ICPCs was Father's housing but that the issue had since been resolved. Father's counsel also requested "an expedited ICPC for [Father]" so that Child could be placed with Father. In making that request, Father's counsel acknowledged the split of authority on whether the ICPC applies to natural parents. But Father's counsel also noted that the shelter statute required DCFS to "conduct a background check and a home study" and despite possible alternatives, "the ICPC is the primary means" DCFS uses to complete that process. The court denied the request.

¶21 The case then proceeded to trial. After trial, the court issued a written order terminating Father's parental rights as to Child.[2] As part of its reasoning, the court found that Father "abandoned [Child] in that he has failed to show the normal interest of a natural parent without just cause." Additionally, Father failed to "remedy the circumstances that caused and continue to cause [Child] to be in . . . [an] out-of-home placement[]." The court also indicated that Father was "given the opportunity [to] have an ICPC conducted to have [his residence] walked through and the safety of the environment assessed" but the ICPC was "not completed and denied due to the inaction or instability of" Father.

¶22 Father appealed the termination order to the court of appeals. *See* UTAH CODE § 78A-4-103(3)(c) (granting the court of appeals appellate jurisdiction over appeals from the juvenile courts). He argued that his court-appointed trial counsel rendered ineffective assistance for failing to argue that the ICPC process does not apply to natural parents. The court of appeals certified the case to us. *See id.* § 78A-4-103(5); UTAH R. APP. P. 43(a).

---

[2] The court also terminated Mother's parental rights as to Child and Infant.

**ISSUE AND STANDARD OF REVIEW**

¶23 On appeal, Father argues that his trial counsel provided ineffective assistance by failing to argue that the ICPC process does not apply to natural parents and for not requesting alternatives to the ICPC.[3] Utah appellate courts address a claim for ineffective assistance of counsel as a question of law. *See State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162; *In re S.S.*, 2015 UT App 230, ¶ 20, 360 P.3d 16.

**ANALYSIS**

¶24 In Utah, parents have a statutory right to counsel in parental rights termination proceedings. UTAH CODE §§ 78B-22-201(1)(b)(iii), 80-4-106(1)(b); *see also State ex rel. M.M.*, 2003 UT 54, ¶ 7, 82 P.3d 1104. This statutory right to counsel "implicitly guarantees effective assistance of counsel." *State ex rel. M.M.*, 2003 UT 54, ¶ 7 (cleaned up).

¶25 In criminal cases where the right to counsel is guaranteed by the Sixth Amendment, we review claims of ineffective assistance of counsel under the well-known standard from *Strickland v. Washington*, 466 U.S. 668 (1984). The court of appeals has expressly adopted the *Strickland* standard in the parental rights termination context. *See In re E.H.*, 880 P.2d 11, 13 (Utah Ct. App. 1994). But this court has never decided whether that constitutional standard applies when an ineffective assistance claim arises from a statutory right to counsel.

¶26 This case does not present an opportunity to answer that question. None of the parties have argued that a different standard should apply, and we conclude that Father's claim fails even under the *Strickland* standard.

¶27 To establish ineffective assistance of counsel under *Strickland*, a party must show: (1) "counsel's performance was deficient in that it 'fell below an objective standard of reasonableness' and (2) 'the deficient performance prejudiced the defense.'" *State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350 (quoting *Strickland*, 466 U.S. at 687–88). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim,

---

[3] In his opening brief, Father raised a second issue: whether the juvenile court erred when it determined that DCFS made reasonable efforts to prevent termination of his parental rights. At oral argument, Father acknowledged that this issue had likely not been properly preserved and withdrew it from consideration.

we are free to address [a party's] claims under either prong." *State v. Samora*, 2023 UT 5, ¶ 21, 529 P.3d 330 (cleaned up).

¶28 We resolve this case on the first prong. The deficiency prong of the *Strickland* standard "sets a high bar for [a party], given the strong presumption that trial counsel rendered adequate assistance and exercised reasonable professional judgment." *State v. Eyre*, 2021 UT 45, ¶ 22, 500 P.3d 776 (cleaned up). To guide our inquiry, we consider a number of factors, such as the "prevailing professional norms" and "whether counsel's actions can be considered strategic plays." *State v. Baugh*, 2024 UT 33, ¶ 19, 556 P.3d 35 (cleaned up). We also look at "what the record tells us about what the world looked like when [a party's] counsel forwent [an action]," *State v. Carter*, 2023 UT 18, ¶ 46, 535 P.3d 819, to determine whether the unraised argument was "a battle that competent counsel would have fought," *State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871. The ultimate question is "whether counsel's act or omission fell below an objective standard of reasonableness." *Id.* ¶ 36.

¶29 In his opening brief, Father argued that his counsel performed deficiently in three respects: (1) by failing to object when the court first ordered the ICPC in March 2023; (2) by failing to object at the October 2023 Hearing to using the ICPC process after Georgia denied the ICPC; and (3) by requesting an expedited ICPC rather than proposing an alternative method at the January 2024 Hearing. Father has since conceded that he forfeited any challenge to the ICPC ruling that occurred in March 2023 by failing to appeal the subsequent adjudication order. The question then is not whether trial counsel performed deficiently by failing to object to the ICPC in the first instance, but whether trial counsel should have asked the court to later reconsider using the ICPC process to investigate the appropriateness of the placement with Father.

¶30 Father's principal argument is that the ICPC does not apply to parental placements. He contends that the plain language of the ICPC "limits its scope to placements of children in foster care or placements preliminary to an adoption" and that his counsel should have objected to using that process to assess the appropriateness of a parental placement. (Citing UTAH CODE § 80-2-905(III)(1).)

¶31 Utah's appellate courts have never answered the substantive question of whether the ICPC applies to natural parents. *See In re K.S.*, 2022 UT App 68, ¶¶ 37–38, 512 P.3d 497 (noting that whether the ICPC applies to natural parents is an issue

of first impression in Utah but declining to reach it through the plain error exception to preservation). But because Father did not preserve this issue below, he now raises it under the ineffective assistance of counsel exception to preservation. Although claims of ineffective assistance of counsel require "the court to look at the substantive issue the [party] argues his counsel should have raised," that issue "is only viewed through the lens of counsel's performance." *State v. Johnson*, 2017 UT 76, ¶ 22, 416 P.3d 443.

¶32   In *In re K.S.*, a parent presented the ICPC issue to the court of appeals through the plain error exception to preservation. 2022 UT App 68, ¶ 23. The court of appeals noted the split in authority on the issue, *id.* ¶¶ 35–36, and stated that "Utah's appellate courts, at some point, may need to weigh in on this question," *id.* ¶ 37. But it declined to reach the issue because the plain error context of the case did not "present an appropriate opportunity" to resolve that question. *Id.* We take a similar approach in this case. Viewing the issue through the lens of counsel's performance, we can determine that Father's counsel did not perform deficiently without deciding whether the ICPC applies to natural parents. As in *In re K.S.*, this case does not present an appropriate vehicle for us to weigh in on the applicability of the ICPC to natural parents.[4]

¶33 Father acknowledges that, before a child can be placed with "another parent with whom the child was not residing," the juvenile court must determine "the fitness of the parent" and "the safety and appropriateness of the placement." UTAH CODE § 80-3-302(2)(a), (c)(i). But he contends that the ICPC process is arguably more restrictive or onerous than what the shelter statute requires, and it is therefore an impermissible impediment to placing a child with a natural parent.

---

[4] Like the court of appeals, we acknowledge that "at some point, [we] may need to weigh in on this question." *In re K.S.*, 2022 UT App 68, ¶ 37, 512 P.3d 497. We also appreciate the parties' efforts to thoroughly brief the issue. But a case in which the issue was not raised below—and thus can only be reached through the ineffective assistance or plain error exception to preservation—is often a poor vehicle to resolve a legal question of first impression. Even if the ICPC does not apply to natural parents, it does not automatically follow that the juvenile court would be prohibited from taking advantage of the existing ICPC process to determine the suitability of an out-of-state parental placement if none of the parties object.

¶34 Even assuming that is true, the juvenile court must conduct some form of inquiry to make its findings under the shelter statute. In *In re K.S.*, a parent whose rights had been terminated made a similar argument regarding the applicability of the ICPC. 2022 UT App 68, ¶¶ 38–41. The court of appeals noted that under the shelter statute it would be "impractical for the court to order DCFS to visit" the out-of-state home, unlike if the parent lived in Utah. *Id.* ¶ 40. "Instead, the court need[s] to come up with some mechanism for inspection of" the out-of-state home. *Id.*

¶35 The record indicates that juvenile courts commonly use the ICPC process to determine the safety and appropriateness of the placement described in section 80-3-302(2)(c), when the placement would occur across state lines. Father's counsel was aware of this practice and "acknowledged that the ICPC was the main process DCFS used to perform its duties to do a background check and home check" outside of Utah. Although Father has proposed alternative processes on appeal, there is no indication in the record that such alternatives are normally available or employed by juvenile courts in similar cases. The court of appeals has opined that such alternatives are "impractical." *Id.* It was not objectively unreasonable for an attorney practicing in this area of law to have reached a similar conclusion.

¶36 And even if feasible alternatives existed, it was not objectively unreasonable to conclude that the ICPC process was the best way to complete the inquiry needed under the shelter statute. Father has not shown that an ICPC is meaningfully slower or less efficient than the alternatives he suggests on appeal. Attempting to devise an alternative process could have been more time-consuming, leading to additional delays. Regardless of whether the ICPC governs parental placements, Father's counsel made a reasonable decision to proceed with the process that was normally followed under these circumstances.

¶37 Still, Father argues that, once the initial ICPC was denied, his counsel should have proposed an alternative. The denial from Georgia officials states that Father "plans to be moving in the near future and does not wish to start the assessment process until he is moved and settled." But at the October 2023 Hearing, Father claimed that Georgia could not complete the ICPC because Father was living in a hotel rather than a traditional residence. Father argues that his counsel rendered deficient performance by not objecting to the ICPC at that point because "the State

acknowledged that . . . Father living in a hotel in Utah would not necessarily have been a bar to Father receiving custody of Child." Under those circumstances, Father contends that reasonable counsel "would have argued that requiring Father to pass the ICPC was creating impermissible barriers."

¶38 Even assuming that Father's characterization of the denial was accurate, it was not objectively unreasonable for counsel to forgo proposing alternatives when he knew that Father's temporary residence in a hotel was not a permanent impediment to completing the ICPC. Father's counsel represented to the court that Father was going to move to new housing within "another couple of weeks" and could complete the ICPC then. Indeed, the denial letter stated that Father had been informed that Utah could "complete a new referral once he is moved and settled." Counsel understood that the only problem for Georgia officials was Father's housing—a problem that Father was on the cusp of solving. Given that Father's move to a stable long-term residence was imminent, it was objectively reasonable for counsel to conclude that it would be more efficient and productive to allow Georgia officials to complete the ICPC home study, rather than ask the court to fashion a new process.

¶39 Father also claims that his counsel rendered deficient performance at the January 2024 Hearing when his counsel requested an expedited ICPC. Father argues that his counsel "unreasonably declined to ask the court to order alternative methods," including "having Father order his own background check and have a DCFS caseworker fly to Georgia." Instead, Father's counsel notified the court that the issue with Father's housing had been resolved and requested "an expedited ICPC" so that Child could be placed with Father.

¶40 In making that request, Father's counsel acknowledged a split of authority on whether the ICPC applied to a natural parent like Father. But Father's counsel also noted that the shelter statute required DCFS to "conduct a background check and a home study" and, despite possible alternatives, "the ICPC is the primary means" DCFS uses to complete that process.

¶41 The parties invoke counsel's acknowledgement of the issue below as proof that counsel either did or did not perform deficiently. Father argues that his counsel's awareness of the split of authority should have led him to raise a challenge to the ICPC once counsel realized it was an impediment to Father's ability to

have custody of Child. The State contends that Father's counsel could not have performed deficiently by not challenging the applicability of the ICPC "given the unsettled state of the law."

¶42 We disagree with the State that the unsettled nature of the law necessarily means that counsel acted reasonably in failing to raise the issue. We have previously indicated that our review of an attorney's performance is not limited "to the law in effect at the time." *State v. Silva*, 2019 UT 36, ¶ 20, 456 P.3d 718. Thus, "trial counsel is [not] categorically excused from failure to raise an argument not supported by existing legal precedent." *Id.* ¶ 19.

¶43 But, just as importantly, "there is no such thing as per se deficient performance." *Eyre*, 2021 UT 45, ¶ 22. Even assuming that it would be error for the juvenile court to use the ICPC process if the compact does not apply to natural parents, "not objecting to an error does not automatically render counsel's performance deficient." *Ray*, 2020 UT 12, ¶ 31. "We must view a decision to not object in context and determine whether correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *Id.* ¶ 32.

¶44 Father has not convinced us that competent counsel would have fought this battle. Indeed, the decision to ask for an expedited ICPC rather than challenge the applicability of the compact "could have been intended to further a reasonable strategy." *Id.* ¶ 34. By the time of the January 2024 Hearing, the juvenile court had changed the permanency goal to adoption, Father had already failed two ICPCs due to unstable housing, and Father was facing an imminent decision on DCFS's petition to terminate his parental rights. Father's counsel could have reasonably determined that the court would be more likely to allow one final attempt at the ICPC given that Father had new housing, rather than to order DCFS to use untested alternatives. Counsel's last-ditch effort to convince the court to allow Father to complete the ICPC process was within the wide range of reasonable decisions counsel could have made in these circumstances. *See Strickland*, 466 U.S. at 689 (explaining that the appellant must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").

## CONCLUSION

¶45 Father has not shown that trial counsel's acquiescence to an ICPC was objectively unreasonable. Even if the ICPC does not

apply to natural parents, competent counsel could have reasonably concluded that it was an expedient way to evaluate the suitability of placement with Father and that alternative methods would be impractical or unlikely to meet with the court's approval. Because counsel's performance was not objectively deficient, Father has not established ineffective assistance of counsel even under the *Strickland* standard. Affirmed.

———————